

# Town of Mashpee

*16 Great Neck Road North*
*Mashpee, Massachusetts 02649*

### Special Permit Decision

**Blue Sky Towers II, LLC**
**150' monopole-type personal wireless service facility**
**101 Red Brook Road**
**Mashpee Firestation #2**
**Mashpee, MA 02649**

## I. BACKGROUND / PROCEDURAL RECORD

This decision concerns the application of Blue Sky Towers II, LLC. of 352 Park Street, Suite 106, North Reading, MA, 01864 (the "Applicant") for approval of a Special Permit to erect a 150' monopole-type personal wireless service facility at 101 Red Brook Road, Fire Station #2, Mashpee, MA 02649. The Property is identified on the Mashpee Assessors Maps as Map 104 Block 2.

The proposal includes the construction of a 150' monopole-type personal wireless service facility within a 70'x70' fenced-in compound on a 100'x100' leased area adjacent to the Mashpee Fire Substation at the same address. The proposal includes driveway access to the compound from the fire substation parking area. The proposed monopole shows space for up to four (4) wireless providers with two (2) providers attached to this application, Verizon Wireless and T-Mobile. The proposal also includes space for Town EMS antenna system.

The applicant was the successful bidder of a Request for Proposals, the 'RFP', issued by the Town of Mashpee in May 2017. The applicant was awarded the project and entered into a lease agreement with the Town in July 2017. The Applicant submitted an application for the construction of a 150' monopole-type personal wireless service facility on May 4, 2018. The applicant withdrew the application, without prejudice, on June 19, 2019. Prior to the application's withdrawal, this project was referred by the Planning Board on June 6, 2018 to the Cape Cod Commission for review as a Development of Regional Impact pursuant to the Cape Cod Commission Enabling Regulations Governing Review of Developments of Regional Impact, Section 3 (i)(1). The Cape Cod Commission approved this project on October 18, 2018 and is recorded in the Barnstable County Registry of Deeds in Book 31689 Page 331.

The applicant filed a petition with the Mashpee Zoning Board of Appeals on January 10, 2019 requesting a variance under all provisions of §174-45.3(E)(1) and §174-45.3(E)(2) of the Mashpee Zoning Bylaws and M.G.L. c.40A §10. Variance relief of 116' in height was granted by the Board of Appeals on February 13, 2019 and filed with the Town Clerk on February 27, 2019. That decision was appealed in Barnstable Superior Court (No. 1972CV130) with notice of the appeal being filed with the Town Clerk on March 19, 2019.



### Town of Mashpee

*16 Great Neck Road North*
*Mashpee, Massachusetts 02649*

### II. Jurisdiction.

The application was made and this decision is issued by the Mashpee Planning Board pursuant to Article VI, §174-24.C. (Special Permit Use) and §174-25 (H)(9); Article IX, §174-45.3. (Personal Wireless Service Facilities) of the Mashpee Zoning Bylaws as they existed on October 16, 2019, the date on which the special permit application was denied by the Mashpee Planning Board.   Where reference is made herein to the Mashpee Zoning By-law, it shall refer to the provisions thereof as they existed on said date.

### III. Chronology.

The application for this special permit was filed with the Town Clerk on August 2, 2019. A hearing was opened before the Mashpee Planning Board at the Mashpee Town Hall, 16 Great Neck Road, North, Mashpee, Massachusetts on September 4, 2019.   Notice was duly given to abutters in accordance with Massachusetts General Law Chapter 40A.   Notice was given by publication in the Mashpee Enterprise, a newspaper of general circulation in the town of Mashpee on August 16, 2019 and August 23, 2019.

### IV. Decision and Conditions

On October 16, 2019, upon a motion made by John Phelan and seconded by Joseph Callahan to approve the project conditional upon the decision by the Zoning Board of Appeals to grant a variance to the applicant being upheld by the Barnstable Superior Court, the Planning Board voted 2-3 in favor of the proposed special permit application.  The members of the Planning Board were recorded as follows: members Phelan and Callahan were recorded as voting in favor and members Waygan, Balzarini and Cummings as voting against.   As a Special Permit application requires at least 4 favorable votes of a 5 member Board, the motion to approve failed and the special permit was not approved.

In voting against the proposal, Members Waygan, Cummings, and Balzarini made the following findings:

- Proposed monopole would inflict the precise adverse impacts that provisions of the Mashpee Zoning Bylaw were enacted to prevent.

- The proposed monopole will inflict dramatic and wholly unnecessary adverse impacts upon the aesthetics and character of neighboring homes.

- The proposed monopole would inflict substantial and wholly unnecessary losses in the values of adjacent and nearby residential property values.

- The applicant has failed to demonstrate that less intrusive and more compliant alternatives are not available. Further, it is unreasonable for the applicant to reject and defeat less intrusive and more compliant alternatives due to the voluntary response to the RFP and execution of the lease with the Town of Mashpee.



# Town of Mashpee

16 Great Neck Road North
Mashpee, Massachusetts 02649

- The Town of Mashpee Zoning Bylaws do not allow the proposed wireless communications facility at 101 Red Brook Road, Mashpee, MA 02649 as the property is outside of the Wireless Facility Overlay District.

- October 2018 Mashpee Town Meeting did not amend the Town of Mashpee Zoning Bylaws to include 101 Red Brook Road, Mashpee, MA 02649 in the Wireless Facility Overlay District.

- Mashpee Zoning Board of Appeals decision for a variance V-2019-10 is not effective in this matter as the decision is not recorded with the Barnstable County Registry of Deeds.

- Mashpee Zoning Board of Appeals decision for a variance V-2019-10 will never be effective in this matter pursuant to Mashpee Zoning Bylaw Article VI, §174-24K, "No use specifically listed in the table of use regulations shall be allowed by the Zoning Board of Appeals in any district where is it prohibited," and Massachusetts General Laws Chapter 40A, §10, "Except where local ordinances or bylaws shall expressly permit variances for a use, no variance may authorize a use or activity not otherwise permitted in the district in which the land or structure is located.

- Mashpee Zoning Board of Appeals decision for a variance V-2019-10 would not be effective in this matter even if the property were located within the Wireless Facility Overlay District pursuant to Mashpee Zoning Bylaw as it is the Planning Board, not the Zoning Board of Appeals, which may grant a waiver to allow additional height of a personal wireless service facility of within the Wireless Facility Overlay District.

- The applicant fails to address the how the proposed wireless service facility will be monitored and maintained, and how it shall bond the facility in case of abandonment or discontinuance of use as required by Article IX, §174-45.3.L Monitoring and Maintenance provisions (1), (2), and §174-45.3.M Abandonment or Discontinuation of Use provisions (1), (2), and (3)

In voting for the proposal members Phelan and Callahan made the following findings:

- Variance relief was granted by the Mashpee Zoning Board of Appeals and the proposed 150' monopoles location outside of the Wireless Facility Overlay District is irrelevant unless that decision is overturned.

- The proposed monopole would not inflict dramatic and wholly unnecessary adverse impacts upon the aesthetics and character of neighboring homes given that the applicant stated a commitment to camouflaging the proposed monopole at the discretion of the Planning Board, and also that its proposed location mitigates visibility to as many neighboring homes as is feasible.

- The proposed monopole would be a dramatic benefit to public safety as there is a significant coverage gap in South Mashpee impacting emergency response.

 *Town of Mashpee*

*16 Great Neck Road North*
*Mashpee, Massachusetts 02649*

- The Telecommunications Act of 1996 has specific regulations regarding the monitoring and maintenance and/or abandonment or discontinuance of a wireless communications facility.

- The October 2018 Town Meeting vote that defeated a warrant article that would have included 101 Red Brook Road in the Wireless Facility Overlay District does not constitute a denial of the proposed application.

- The applicant provided expert testimony that shows personal wireless service facilities bear no maleffect on neighboring property values.

- Alternative site analysis demonstrated no feasible alternative sites. Further, expert testimony showed that alternative technologies would not adequately address the identified coverage gap, and are not options.

The written record supporting this decision includes the meeting minutes of September 4, 2019, October 2, 2019 and October 16, 2019, attached hereto, and materials submitted to the Planning Board including the application and all exhibits (1-40).



# *Town of Mashpee*

*16 Great Neck Road North*
*Mashpee, Massachusetts 02649*

## V. Signature and Filing.

This special permit decision was made by the Mashpee Planning Board on this 16th day of October 2019.

A true copy
Attest

*Mary Elaine Waygan*
Member, Mashpee Planning Board

### COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss.

October 23, 2019
Date

On this 23 day of October 2019, before me, the undersigned notary public, personally appeared Mary Elaine Waygan a member of the Mashpee Planning Board, proved to me through satisfactory evidence of identification, which were personally known , to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he/she) signed it voluntarily for its stated purpose.

*Theresa M. Cook*
Notary Public    Theresa M. Cook
My Commission expires: July 22, 2022
Date of expiration

THERESA M. COOK
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
July 22, 2022

A copy of this decision has been duly filed on Oct 24, 2019 with the Town Clerk of Mashpee.

*Deborah Dami*
Town Clerk

Notice of this decision was mailed on October 24 , 2019 to the applicant, to the parties in interest designated in M.G.L. Chapter 40A, Section 11 and to all persons at the hearing who requested such notice. Any appeal shall be made pursuant to Section 17 of the Chapter 40A of the Massachusetts General Laws within twenty (20) days after the date of said filing.

I, _____, Town Clerk of the Town of Mashpee, hereby certify that a copy of this decision was filed with the office of the Town Clerk on _____, 2019 and that no appeal of that decision was filed within twenty (20) days thereafter.

_____
Date

_____
Town Clerk



# Town of Mashpee

16 Great Neck Road North
Mashpee, Massachusetts 02649

Upon expiration of the statutory appeal period with no appeal having been filed, this special permit decision has been signed by the Mashpee Planning Board on _____, 2019 and may be recorded.

_____

_____

_____

_____

_____

**Mashpee Planning Board**
**Minutes of Meeting**
**September 4, 2019 at 7:00 p.m.**
**Mashpee Town Hall-Waquoit Meeting Room**
**16 Great Neck Road North**
**Approved 10/16/19**

**Present:** Chairman Mary Waygan, Vice Chairman Joe Cummings, Dennis Balzarini, John (Jack) Phelan, Joseph Callahan, Robert (Rob) Hansen (Alt.)
**Also:** Evan Lehrer-Town Planner, Charles Rowley-Consultant Engineer

**CALL TO ORDER**
The Town of Mashpee Planning Board meeting was opened with a quorum in the Waquoit Meeting Room at Mashpee Town Hall by Chairman Waygan, at 7:02 p.m. on Wednesday, September 4, 2019. The Chair welcomed attendees and the Pledge of Allegiance was recited. The Chair stated that the meeting was being videotaped and recorded and noted that, if the public addressed the Board, to do so stating their name, address and comment. Comments should be made through the Chair, after being acknowledged, and may be addressed directly by the Board, the project proponent, staff, consultant engineer or taken under advisement.

**APPROVAL OF MINUTES—August 7, 2019**
**MOTION: Mr. Balzarini made a motion to accept the August 7th minutes as presented. Mr. Callahan seconded the motion. All voted unanimously.**

**PUBLIC HEARINGS**
7:05 p.m.        **Best Buy Beverage (Continued from 8/21/19)**
                 **Application for a Special Permit filed by Kevin Andrade to construct a commercial building to be used for retail use, redemption center and office space to be located at 11 Evergreen Circle, currently identified as Lot A on the plan titled Definitive Subdivision Plan, Evergreen Circle, prepared for Evergreen Industrial Park, #588 Main Street (Route 130) approved on 11/20/17 by Mashpee Planning Board. This application is made pursuant to Sections 174-24 C (1) and under Section 174-25 E (12) under the Mashpee Zoning Bylaw. The property is located in the C-3 Zoning District and is within the Light Industrial Overlay District.**

The appointed time having arrived, the Chair opened the Public Hearing and read the Public Hearing Notice and request. Raul Lizardi-Rivera, Cape and Islands Engineering, represented the applicant and returned to address additional information requested by the Board. Mr. Lizardi-Rivera confirmed that plans had been revised and submitted, including the water quality report previously submitted by Evergreen, turning movement reports for emergency vehicles and revised building elevations and footprint, which reflected the standards requested by the Cape Cod Commission. Projections and awnings added character to what was previously a plain rectangular building and traditional materials replaced what were initially metal walls. Mr. Lizardi-Rivera confirmed that all comments provided by Mr. Rowley were addressed except for 1) fire/water service off of Route 130 instead of Evergreen Circle, due to water pressure concerns expressed; 2) grading adjustment at the entrance that would have placed the driveway at an 8% slope, but showing that the water would be directed to the waterway with some adjustments; and 3) changes to the landscape material, including ground cover species.

1

The Chair invited Board and staff members to comment.  Mr. Callahan stated that the applicant addressed concerns expressed by the Board.  Mr. Phelan agreed that most of the issues were addressed.  Mr. Cummings had no concerns.  Mr. Balzarini appreciated the changes to the exterior.

Mr. Lehrer agreed that the proposed architectural designs were an improvement over what was previously submitted and were in compliance with the Cape Cod Commission Design Guidelines.  Mr. Lehrer noted that the narrative was abbreviated and asked that more information be included as to why the design choices were made.  Mr. Lehrer added that, as a site located in the C-3 District, 40% of the lot was required to remain undisturbed natural, adding that Mr. Rowley had initially pointed out that the calculation did not appear on the plans.

Mr. Lizardi-Rivera discussed the architectural changes made to the building, originally intended to be metal, and would include a central portion made up of cedar shingles, with the wings featuring vinyl siding.  The two entrances were shifted to the corners with awnings above, to create a projection.  The bottom of the façade would also feature barn board.  The building sign would now be facing Evergreen Circle.

The natural open space calculations had been added to Sheet 1 and met zoning compliance of 50%, including improvements and had been considered by Plan and Design Review where more native species were requested in the landscaping.   Mr. Lehrer inquired whether the 50% calculation was undisturbed, as required and Mr. Lizardi-Rivera responded that it was disturbed but replaced with landscaping.  Mr. Lehrer inquired how much of the land would be undisturbed and how much would be landscaped but Mr. Lizardi-Rivera was unsure of the exact calculations.  Mr. Lehrer reiterated that 40% needed to remain undisturbed, unless relief was being sought and granted.   The Chair requested that the calculations be provided to the Board.  Mr. Lizardi-Rivera stated that the land on Main Street had already been disturbed previously.  There was disagreement regarding zoning interpretation of disturbed and undisturbed land, if the land had already been disturbed.  The Chair stated that the note would need to be added to match the zoning bylaw in the zoning compliance table and Mr. Rowley agreed that compliance needed to be shown.  The Chair believed that the intent of the Bylaw was that the final product be left in its final state but Mr. Lehrer suggested that use of "undisturbed" meant prior to development of the site.  Mr. Lizardi-Rivera stated that the C-3 district was completely disturbed.  Mr. Phelan agreed with both viewpoints.

Mr. Rowley referenced the location of the water main and sprinkler system, and the need to clear the trees that would impact the undisturbed area, adding that it would be fine if it was a Water District preference, as there would be little difference.  Regarding drainage, Mr. Rowley expressed concern about the shifts in the crown shedding the water to one side, suggesting the possibility that plowed snow may block the drainage areas, directing water to Evergreen Circle, which was not designed to manage additional flow from other sites.  Mr. Rowley had suggested that the low point be adjusted and the runoff contained within the site.  There was agreement for Mr. Rowley and Mr. Lizardi-River to work on the matter further.

There was no public comment.

Mr. Lizardi-Rivera inquired whether the Public Hearing could be closed, action taken and revisions be included in the conditions due to a closing for the property. Mr. Lizardi-Rivera stated that he would be agreeable to incorporating Mr. Rowley's comments into the plan and change the zoning compliance table. Mr. Lehrer inquired whether the Board wished to take a vote without the draft decision. The Chair stated that they could close the Public Hearing, excluding further discussion regarding the draft decision at the next meeting. Mr. Lehrer would draft a decision including the conditions.

**MOTION: Mr. Balzarini made a motion to close the Public Hearing. Mr. Cummings seconded the motion. All voted unanimously.**

There were no additional comments from Board members.

**MOTION: Mr. Balzarini made a motion to approve the project as amended with two changes; 1) that the Zoning Compliance Table is amended to reflect the proper verbiage regarding the undisturbed natural space and 2) that the low point for the drainage area closest to Evergreen Circle will be modified to eliminate runoff toward Evergreen Circle. Mr. Callahan seconded the motion. All voted unanimously.**

Mr. Callahan will sign the signatory page.

| 7:10 p.m. | **Blue Sky Towers II, LLC** |
|---|---|
| | **Application for a Special Permit to erect a Personal Wireless Service Facility as required by Section 174-25 (H)(9); 174-45.3 of the Mashpee Zoning Bylaw at 101 Red Brook Road, Mashpee Fire Station #2 consisting of a 150' monopole. This Public Hearing is being reopened by the Planning Board following referral to the Cape Cod Commission as a Development of Regional Impact (DRI).** |

The appointed time having arrived, the Chair opened the Public Hearing for Blue Sky Towers II, LLC and read for the record the Public Hearing Notice and request. The Chair read a statement regarding the process as to how the matter would be discussed and considered during the Public Hearing, beginning with a presentation from the project proponent. The Chair explained that a prior proposal had been submitted, but withdrawn without prejudice. All testimony, materials or information submitted previously would need to be submitted again for Board consideration.

Attorney Elizabeth Thompson, representing Blue Sky Towers II, LLC, described the proposal for a 150 foot monopole telecommunications tower to be located at Mashpee Fire Station #2 at 101 Red Brick Road. Verizon Wireless cellular service would be located at 146 feet, T-Mobile at 136 feet and Mashpee emergency management system at 100 feet. Space remained for two additional providers. Equipment for the facility would be located at the base of the tower, surrounded by fencing.

The project proposal was in response to an RFP award issued by the Town of Mashpee to allow greater control of the site and to generate revenue for the Town and increase wireless access for the Town. The project proponent was required to identify any alternative sites that would be feasible and discovered that there was no existing cell tower or roof tops available in the search area to accommodate the coverage gap, requiring Blue Sky Towers to consider raw land sites. It was determined that the proposed site was the only feasible location.

Ms. Thompson referenced a site in New Seabury where Verizon previously held a lease, but the lease had been terminated by New Seabury, and New Seabury was not interested in pursuing a new agreement when Verizon again approached them. Ms. Thompson recently reached out again to New Seabury management, who initially expressed interest in the proposal, but the identified site was listed as an Agreement for Judgement under the Cape Cod Commission and New Seabury, and fell under conservation and/or recreation restrictions. Ms. Thompson provided details in Exhibit 50.

Ms. Thompson referenced the DRI decision from the Cape Cod Commission, who approved the cell tower in October 2018. Ms. Thompson read portions of their decision. Once the project proponent learned that the proposed site did not lie within the Wireless Overlay District, they sought relief and were granted a variance from Mashpee's Zoning Board of Appeals to build the 150 foot cell tower.

Ms. Thompson cited the Telecommunications Act of 1996, suggesting that the Board had to consider the TCA due to the existing significant gap of coverage in Mashpee. Additionally, Ms. Thompson stated that there was case law that would support the interpretation, with further information available in Exhibit 60. Ms. Thompson stated that, this was the only feasible proposal, not only as a matter of convenience but for critical emergency life-saving operations, specifically for the area of South Mashpee.

Keith Vallente, a radio frequency engineer representing Verizon, referenced a report and maps to visually identify the needs of Verizon, located in Exhibit 9. Mr. Vallente discussed three existing towers, 140 feet in Falmouth, 70 feet in East Falmouth and Mashpee South Industrial Drive at 142 feet. Although the cell towers provided some coverage to the area, the topography and distance made it unable to support reliable communications, creating a coverage gap in the southern portion of Mashpee. The cell tower site at Red Brook Road would increase coverage for 1,400 additional residents over an area of 2.2 miles and create a more robust network in the area. Mr. Vallente noted that Verizon was greatly challenged by providing sufficient coverage with increased usage of multiple wireless devices. Mr. Vallente also described the way in which coverage areas on the fringe of cell towers offered erratic service, creating more of a burden to the distant cell tower. A cell tower in closer range would provide better coverage.

Mr. Cumming and Mr. Balzarini referenced the maps and inquired further about the existing towers and continued gaps in coverage despite the addition of the new cell tower. Mr. Cummings inquired about using lower posts closer to areas where more coverage was needed. Mr. Vallante, referenced the map and stated that coverage would be degraded in some areas where it would be less reliable due to a high spot, but would still exist. Mr. Balzarini inquired about coverage for other providers with their location lower on the tower and Ms. Thompson responded that T-Mobile would present their coverage, but that no other provider had yet been contracted.

Mr. Callahan inquired whether the area under the service threshold would allow phone calls. Mr. Vallente responded that there were a number of factors to determine coverage level, and could depend upon number of users at one time, network loading and what users were doing at a particular time. Ms. Thompson added that there was no perfect site to serve every deficient spot, particularly with a large gap. Ms. Thompson added that there was a mandate by the Federal government to cover every area, as they can, with reasonable speed, until a secondary future plan could be developed.

Mr. Balzarini inquired whether the site in New Seabury could have closed the coverage gap. Ms. Thompson stated that there was a proposal, but that she did not state that it would cover everything. Mr. Balzarini inquired why the Federal mandate would not apply to the New Seabury site and Ms. Thompson responded that the site was not feasible because there was not a willing landlord and the site considered had conservation restrictions. Mr. Balzarini inquired about the wildlife sanctuary located near the proposed site and Ms. Thompson responded that it did not sit within the boundary area and reference Exhibit 5.

Mr. Cummings inquired about the use of Verizon antennas on telephone poles in New Seabury and Ms. Thompson stated that she was unaware of any such arrangement. Ms. Thompson referenced Exhibit 10 regarding a letter and feasibility of using alternative technology, and the reasons it would not work. Likewise, Exhibit 14 was a report from T-Mobile stating that alternative technology would not be feasible.

There was discussion regarding the information provided by the cellular services to Blue Sky Towers, and the Radio Frequency Engineers hired by the cellular services to conduct the studies and information regarding closing the coverage gap.

Richard Karreocke, representing T-Mobile, referenced his Exhibits 12, 13 and 14. Mr. Karreocke described T-Mobile's need to extend coverage and its location at 135 feet, with the proposed cell tower. Existing coverage was currently offered at three sites, at 130 feet in 550-B Falmouth, 165 feet 512-A Industrial Drive Mashpee and 93 feet in 511-C Falmouth.

Mark Correnti, Residential Appraiser, provided a report located in Exhibit 17. Mr. Correnti stated that he considered existing cell towers, comparing properties and analyzing home sales. Mr. Correnti noted that buyers set the market values. Referencing 9 Nancy Lane with a view of a cell tower, Mr. Correnti indicated that the property sold quickly and above the comparison. A home at 12 Windmere Way also had a view of a cell tower and had a similar sale as its comp. Additional properties at 114 Dover Road and 2 Oxfordshire Place, in sight of cell towers, also featured sales similar to their comps. Mr. Correnti added that there were no filed tax abatements in Mashpee, due to the proximity of the cell towers. Mr. Correnti indicated that buyers were paying full price for properties. Mr. Correnti also referenced his June 13 letter that highlighted information from the National Institute of Science Law and Public Policy and a cell tower study from New Zealand.

Mr. Balzarini inquired about the location of the comps and Mr. Correnti confirmed that they were not located within proximity of a cell tower. Mr. Phelan inquired about the height of the towers in the pictures and Mr. Correnti believed that they were 150 feet and 250 feet. Mr. Callahan inquired whether his company performed other cell tower market studies and Mr. Correnti confirmed that they did.

Ms. Thompson explained the results of the photo simulation package, which included balloons at varying heights and simulations of the fully loaded cell tower at 150 feet and 125 feet, painted light blue, painted light grey and as a monopine.

126/216 Red Brook Road-obscured visibility
95-103 Degrass Road-can be seen
56 Blue Castle Drive-can be seen
48-56 Blue Castle Drive-not visible
1182 Gray Road, 66 Red Brook Road, 701 Great Neck Road South, 50 Sipps Road, 664 & 575
Great Neck Road South, 5 Driftwood Way-not visible
112 Summersea Road-some seasonal visibility
118-120 Polaris Road-not visible

Ms. Thompson noted that all locations were chosen in consultation with the Town and the Cape Cod
Commission. The Chair inquired about the NEPA screening report. Ms. Thompson responded that
there was a separate analysis of historic homes and it was determined that there were no impacts to
historic homes. The Chair ask that the report be provided, referencing a concern previously expressed
about a particular camera angle of a historic home. Ms. Thompson responded that images were
provided in the photo simulations, but that the report could also be provided electronically. Ms.
Thompson noted that the locations depicted included the Aiken Gertrude House, the Amos Horatio
House, Children's Museum and the Landing at Gertrude Way.

There was consensus from the Board for the Chair to open to Public Comment.

Tom Rose, Mashpee Police Captain, stated that south Mashpee had terrible cell and radio service.
Captain Rose specifically referenced the recent micro burst and the lack of service necessary to assist
with coordinating safety efforts. Captain Rose expressed concern about the lack of service for reasons
of safety.

Howard Kahalis, Mashpee and Boston resident, stated that he paid taxes to Mashpee and agreed with
Captain Rose that there was no cell service on the day of the micro burst, and expressed concern about
being able to locate his grandchildren. Mr. Kahalis questioned scheduling meetings after the summer,
when New Seabury residents were not in town. Mr. Kahalis stated that, as taxpayers, they were
entitled to cell service for safety reasons, adding that it would be a breach of fiduciary relationship
should any Planning Board member vote against the proposal, suggesting that any injuries or deaths
resulting from voting against the cell tower would be the responsibility of the Planning Board. The
Chair asked that Mr. Kahalis not threaten Planning Board members and make the issue personal. Mr.
Kahalis stated that he was in favor of the proposal.

Andrew Gregory McKelvey, member of the Finance Committee and resident of Popponesset, stated
that often cell service was available with WIFI or with the help of a cell booster. However, with the
loss of power, there was very limited cell service in the area and he expressed concern regarding
safety, particularly for people with medical issues. The recent microburst created a significant
challenge for safety and accessibility to cell service. Mr. McKelvey supported the proposed cell tower.

Maureen Holland, Uncle Percy's Road, shared her experience during the microburst, including being
unable to leave her property. Ms. Holland expressed safety concerns if she had needed to reach
anyone by cell phone and stated her support for the proposed project.

Denise Peterson, resident of Popponesset, confirmed that she also had no cell service during the microburst, expressing concern if she had needed access to emergency responders, particularly as trees were down and children were outside playing. Ms. Peterson added that, with no electricity, her landline also did not work. Ms. Peterson asked Planning Board members to vote for the cell tower for safety reasons.

Leland Muldowney, Water Way, stated his support for the cell tower, noting that he was a telecommuter who was not able to work from his home without cell service. In addition, Mr. Muldowney pointed out that home values could be diminished by not having adequate cell service.

Scott Benstein, Paddock Circle, expressed concerns about cell service and safety when his parents visit, in case there was a need for access for medical reasons and stated his support for the cell tower.

Bill Peterson, resident of Popponesset, described the tree loss and potential danger as a result of the micro burst and expressed concern about children playing outside afterwards, and the potential need for access to communication in case of an emergency. Mr. Peterson felt as though they were being treated like second class citizens adding that, for three days, they had no access to communication as a result of the microburst and limited road access. Mr. Peterson stated that, as a former law enforcement officer, adequate access was not being provided for the area of Popponesset

Marlene Perkins, Bowsprit Point, expressed concern regarding safety and lack of cell service at the beach. Ms. Perkins stated that no cell service available at the beach impacted the entire community and emphasized that she was in favor of the cell tower.

Laraine Michaelson, Degrass Road, stated that those who opposed the cell tower did not do so because they felt that Popponesset was undeserving of cell service but because they were concerned about the location of the cell tower. Ms. Michaelson inquired whether there had been consideration of placing the facility at the New Seabury Highwood water tower at 111 Rock Landing Road, to allow greater access to cell service. Ms. Michaelson referenced other lawsuits against cell towers due to health and safety issues. Ms. Michaelson further pointed out that property values referenced in the report reflected details from 2015, when concerns regarding cell tower were not available. Ms. Michaelson stated that, as an abutter to the cell tower, she was not opposed to cell service for New Seabury but that she was opposed to the proposed location for this cell tower.

Dana Roberts, Degrass Road, confirmed that the water tower at 111 Rock Landing Road was owned by the Mashpee Water District, and featured 60.5 acres, which could serve as a site for the cell tower. In addition, the site provided a 40-50 foot elevation above the hill of concern, and could address the areas of concern in New Seabury and Popponesset that were lacking coverage. It was Mr. Robert's opinion that, based on the maps of service provided, 25% of New Seabury still would not receive cell service with the cell tower. Mr. Roberts also noted that the maps were mislabeled showing New Seabury located at Degrass Road. Mr. Roberts also inquired about the hiring of an independent RF engineer and the Chair responded that she would ask the Board if they wished to do so. Mr. Roberts also noted that the project proponent responded specifically to the Town's RFP for a cell tower at the Fire Station, suggesting that it was unlikely they considered other sites, but that the priority should be providing service to residents of New Seabury.

Ms. Thompson asked to respond to the speakers and the Chair responded that she would allow Ms. Thompson to respond at the end of Public Comment. The Chair added that she would ensure that the Town Planner forward to Ms. Thompson any materials submitted this evening. Ms. Thompson felt it would be better to respond to each speaker but the Chair wished for the public to speak consecutively.

Terry Ronhock, Sunset Circle, stated that she had attended all meetings and reviewed all materials related to the proposal. Ms. Ronhock agreed that there was no question that New Seabury and Popponesset residents should receive proper service, however, there was question whether the proposal could appropriately solve the problem at the site chosen. Ms. Ronhock discussed the Telecommunications Act, and that denials be based on a reasoned approach, such as the failure to use existing structures within the general service area of the proposed cell tower. Ms. Ronhock referenced the outdoor distributed antenna system that would attach to existing telephone poles, which would address coverage and capacity in a greater area, closer to the water line. The system would also triangulate off of the poles, so would also be particularly helpful for the purposes of safety. This system had been previously considered by New Seabury's Peninsula Club. Ms. Ronhock had inquired previously with David Maxim, RF engineer, about the system, but he had responded that he was hired to review only the monopole system, adding that the system was technically feasible but a burdensome cost to the carrier. Ms. Ronhock noted that it was a system that had been successfully used in Provincetown and Dennis and other areas around the Cape and asked that this alternate system be considered for Mashpee. Ms. Ronhock also inquired about why the need for additional emergency radio repeaters had not been previously discussed, which could have been placed in other areas as needed. Ms. Ronhock referenced prior sites considered and expressed frustration that the 150 foot tower was being placed in a zone that did not allow for cell towers, and use of the site for cell towers being voted down by residents and asked that the Planning Board deny the Blue Sky Towers project in order to consider more viable options.

Inessa Arsentyeva, Old Great Neck Road, expressed concern about the proposed location and its location in the middle of a wildlife area and inquired about research on the project's impact to the Wildlife Refuge and its endangered species.

Michael Ronhock, Sunset Circle and Degrass Road, expressed his disappointment about the previous application being withdrawn, believing that all information was to be rolled over into the new application. The Chair confirmed that materials submitted previously, which would apply to the current application, would need to be resubmitted in order to be considered by all parties. Mr. Lehrer stated that he had brought all correspondence submitted previously by residents and asked to enter it into the record. Mr. Lehrer provided the packet to Mr. Ronhock to review and resubmit it to the Planning Board so that it could also be reviewed by the project proponent. Ms. Thompson stated that she would like to review the letters of support to be resubmitted. It was confirmed that both parties would review what was submitted previously.

Mr. Ronhock agreed that no one wanted the lack of cell service to create an issue of safety. Mr. Ronhock stated that the site had not been selected by science, but instead was selected by convenience. Mr. Ronhock read a statement from the 1996 Federal Communication Act, Section 704, making Federal and State property available. Mr. Ronhock submitted a list of 10-12 parcels owned by the

Federal, State and Town government, located in the area, which totaled 468.33 acres and inquired whether those sites had been considered for use. It was Mr. Ronhock's opinion that the cell tower did not have to be located in anyone's backyard with that many acres available for a cell tower. Mr. Ronhock referenced a previous parcel of conservation land in Mashpee that had been used for infrastructure to create drainage pits. Mr. Ronhock noted that coverage maps continued to show that many areas in Popponesset would still lack coverage with the addition of the proposed cell tower. Mr. Ronhock also referenced the Middle Class Tax Relief Act of February 2012, Section 6409 regarding cell towers, which allowed an additional 10 feet in height to approved cell towers. Mr. Ronhock also referenced the outdoor antennae system that was considered at New Seabury.

Jane Lebel, Lisa Lane, stated that she had attended all previous meetings and felt that the Town should look at all options to ensure that all areas received appropriate cell service coverage.

Erik Lubrano, Blue Castle Drive, believed that Blue Sky had not proven that the proposed site would be the best site for the project and felt that the location was inefficient for the necessary coverage. Mr. Lubrano inquired whether the real estate assessment included discussion with the homeowner to determine whether they were advised to ask for a lower price due to the presence of a cell tower. Mr. Lubrano asked that the Planning Board not vote in favor of the project.

There was no further comment from the Public so the Chair turned to Board members for questions and comment.

Mr. Callahan inquired about the height variance from the ZBA and Ms. Thompson confirmed that the ZBA had approved a height variance of 150 feet. Ms. Thompson confirmed that the variance was found in Exhibit 7 and the DRI was located in Exhibit 6.

Mr. Phelan inquired about the additional percentage increase that could be utilized without additional approvals. Ms. Thompson responded that additional information would be submitted to address the various issues stated. Ms. Thompson indicated that Section 64019 allowed an increase of 20%, but that the project proponent needed only the 150 feet at this time.

The Chair stated that she would be submitting, for the record, the Zoning Bylaw, Mashpee's RFP for a cellular wireless equipment at Fire Station #2 issued in 2016, Lease Agreement between Mashpee and Blue Sky Tower in 2017, the failed Town Meeting vote October 2018 to amend the Bylaw to place the site in an overlay district, ZBA variance appealed by abutters to the Superior Court in March 2019, Massachusetts Chapter 40 Zoning Act and Istotrope Report on the Application to the Cape Cod Commission for the DRI. The Chair asked that the documents be placed on the record for access to the public, the project proponent and to Board members. The Chair also referenced monitoring the cell tower and removal if abandoned, and asked that it be incorporated into the discussions and a plan provided, as found in Mashpee Bylaw Section 174, 45L and Section 174, 45M.

The Chair expressed concern about the Cape Cod Commission's DRI decision as it related to Page 6, Finding 25, stating that the cell tower was in the overlay district. The Chair has asked the Cape Cod Commission to reconsider the decision and strongly recommended that the applicant request a modification. Ms. Thompson responded that she had spoken with Chief Regulatory Officer Idman

who indicated that the location of the wireless overlay district had no impact on the decision. The Chair referenced Cape Cod Commission Act Section D3, and expressed concern that it could be an issue. Ms. Thompson stated that she would ask Mr. Idman to state his opinion in writing. The Chair confirmed that she had been in receipt of his opinion, to which she disagreed, and again recommended that the project proponent seek a modification from the Cape Cod Commission.

Regarding the RFP of 2016, the Chair inquired whether additional sites had been referenced and Ms. Thompson confirmed that it was only the one public site put out to bid, in order to rectify the coverage gap. The Chair inquired whether other sites were discussed with the Town and Ms. Thompson responded that she was not involved in the negotiations regarding the RFP, adding that an RFP was typically for one location. The Chair asked that Ms. Thompson follow up with Blue Sky Towers to find out whether other sites were discussed and Ms. Thompson responded that she could provide information regarding other alternative sites that were identified by Blue Sky Towers and carriers. The Chair asked also who they met with in the Town but Ms. Thompson recommended that the Chair consult with the Town, adding that the RFP was a sealed process until released to the public.

Regarding the coverage area, the Chair inquired whether an analysis had been completed about the amount of conservation space, open space and undeveloped land and Ms. Thompson responded that Federal case law required that the carriers were the only ones that could determine the coverage gap and what was sufficient for their coverage. In addition, although people may not reside in the wilderness areas, the areas were in use and there could be a need for cell service, particularly in case of an emergency.

The Chair referenced the lease and the revenue generation of $2,000 per month. Ms. Thompson confirmed the monthly revenue, adding that there was a capital improvement contribution, which the Chair indicated was in the amount of $100,000 to the Fire Department.

Regarding the balloon tests, the Chair expressed concern about serious impacts to 95-103 Degrass and 56 Blue Castle and inquired whether the project proponent had met with abutters to mitigate the impacts. Ms. Thompson stated that they had not met with the abutters but prior to their application, their project engineer had hosted a meeting, but may not have noticed sufficiently because no one attended. Ms. Thompson stated that the project proponent had been open to any camouflaging techniques preferred to lessen impacts to neighborhoods, adding that infrastructure could not be made invisible and would have some impact on residential views. The Chair noted that comments could still be submitted while the Public Hearing was open. The Chair asked that more information regarding the posting of the meeting be provided and Ms. Thompson stated that it was not a requirement but they did so as a good will gesture. Regarding the lease, the Chair inquired whether there was any discussion regarding the location of the tower and Ms. Thompson responded that it was set by the Town and identified as the least impactful location on the parcel.

Mr. Cummings inquired about the information regarding use of Town, State or Federal property and Ms. Thompson confirmed that she would provide further details, but that there were no Federal or State lands located within the search range that would be a feasible alternative to satisfy the gap. Mr. Cummings also inquired about the viability of the Rock Landing water tower as a site and Ms. Thompson responded that it was not viable due to an RFP needing to be issued for the site, but the RFP

issues was for the Fire Station. In addition, the water tower was located within the Conservation and Open Space restricted area, and moving the tower from one site to another, would likely still have impacts to others. Mr. Cummings inquired about the outdoor antennae distributing systems and Ms. Thompson referenced Exhibits 10 and 14, from the engineers, which indicated that the technology would not be a feasible alternative. Mr. Cummings inquired about increasing the height of the Falmouth antenna and Ms. Thompson responded that they had no control over that tower, and that it would not accomplish the goal to fill the coverage gap.

Mr. Balzarini expressed concern that the coverage maps continued to show gaps in coverage and Ms. Thompson responded that those areas were considered less than acceptable coverage, but there was no one tower that could cover every pocket of coverage, so the goal was to do the best that they could, with other solutions to be considered in the future. Mr. Balzarini expressed concern that another tower could be considered for the future, possibly in New Seabury. Ms. Thompson emphasized that there was no feasible option in New Seabury with one reason being that a private property owner could not be forced into allowing a cell tower. Mr. Balzarini stated that if the tower was approved, he preferred a tree.

The Chair acknowledged Mr. Lehrer who stated that the Water District served as a quasi-government agency, but operated independently of the Town, so was similar to a private landowners. Mr. Lehrer stated his belief that the Water District had been approached but opted not to lease the water tower to a cell phone tower developer. Mr. Lehrer wished to clarify public comments regarding federally owned property but the Chair stated her preference that the project proponent respond to public comments and that Mr. Lehrer provide his technical review of the proposal. Mr. Phelan suggested that Mr. Lehrer share his comments and the Chair expressed her concern that the Town Planner was not a neutral party. Mr. Lehrer stated that he was offering objective information regarding regulations for properties identified by the public for consideration. Mr. Lehrer clarified that the Town Meeting vote in October 2018, which failed, was to include the parcel in question within the wireless overlay, not to support or deny the project being considered. Due to the parcel not being located within the overlay, it was necessary to seek a variance from the ZBA, which was granted. Federal or state properties previously mentioned were likely within the Wildlife Refuge or Tribal properties and would likely have conservation restrictions. Mr. Lehrer added that Chapter 84 allowed for the development of conservation land with the approval of the Conservation Commission. Mr. Lehrer confirmed that he had been in receipt of quotes should the Board wish to hire an RF engineer.

Regarding conservation parcels, Mr. Phelan inquired whether the sites had been considered and Ms. Thompson stated that the restrictions were pursuant to a court settlement and different from seeking approval from the Conservation Commission. The site at the fire station was preferable because it would not have conservation restrictions.

Mr. Rowley was recognized and reported the results of his technical review of the plan dated July 24, 2019. Mr. Rowley stated that the paving detail on the plan should be incorporated into the full set of plans, rather than an attachment. All prior issues had been addressed. Ms. Thompson stated that the sheet detail was included in the exhibits.

Regarding the Board hiring an RF engineer, Ms. Thompson respectively requested that the Board waive the requirement as another review would be duplicative and excessive since an initial review was completed independently for the Cape Cod Commission.  Should the Board choose to hire an RF engineer, the project proponent would only allow to a limited amount of funds.  In reference to public comment made, the RF engineer would not review the coverage maps and would only consider documentation related to FCC standard guidelines.  The Chair stated that the Board was allowed to hire a consultant as it related to a Special Permit application.  Ms. Thompson responded that wireless Special Permits were limited specifically to an RF engineer and suggested consultation with Town Counsel.  The Chair stated that she had been in contact with Town Counsel.  The Chair inquired whether the Board wished to hire a consultant.  Mr. Phelan inquired whether the information was already contained in the packet and the Chair responded that they had been in receipt of the Isotropes Analysis that reviewed a similar project.  Ms. Thompson clarified that they had submitted voluminous information responding to Mr. Maxim's report, adding that his findings could be found in the DRI decision.  There was consensus not to hire a consultant.

**MOTION:  Mr. Balzarini made a motion to continue the Public Hearing to Wednesday, October 2 at 7:20 p.m.  Mr. Cummings seconded the motion.  All voted unanimously.**

Mr. Phelan asked that all information be forwarded to the Board and Mr. Lehrer responded that all exhibits and documents would be added to their binders.  Exhibits would also be added to the website.

A recess was taken at 10:13 p.m. and the meeting reconvened at 10:20 p.m.

**7:30 p.m.      Modi, LLC Application for Special Permit to Construct Coffee Shop with Facilities for Processing and Packaging Coffee, with Future Industrial Tenant at 10 Evergreen Circle, Lot B (Map 19 Block 10) Located in the C-3 Zoning District, within the Light Industrial Overlay District**
The appointed time having arrived, the Chair opened the Public Hearing and read the request from Modi, LLC.  Kevin Kirrane, attorney, and Patrick Johnson from Atlantic Engineering were present to represent the project proponent for this Special Permit request.  Mr. Kirrane stated that some changes had been made to their plans, at the request of abutters, including the retention of a 100 foot undisturbed buffer between the proposed facility and the nearest abutters.  In addition, the outside seating area would be screened with a 6 foot fence, as shown on the plan.  Concerns expressed previously have been addressed and the project would conform to the requirements of the Bylaw.

The Chair inquired about the right angle of the fence, which at the corner changed into a split rail fence, as requested.  A retaining wall would protect a hole, which would remain in a natural undisturbed state, with the lot maintaining a 26% natural state.

Mr. Balzarini stated that the project would be a family-friendly asset to the Town.  Mr. Kirrane stated that a summary was provided demonstrating how the building would conform to the design guidelines set by the Cape Cod Commission.

Mr. Phelan felt that issues seemed to be addressed and he had no further concerns and Mr. Callahan agreed.

12

Mr. Lehrer provided a draft decision.  Mr. Rowley reported that he reviewed the plans with Mr. Johnson and recommended approval.  Mr. Rowley suggested that stormwater operations and maintenance plan be included with the decision and include the language "responsibility of all successive property owners as shown," as drafted in Condition #6.

The Chair invited Public Comment.

Kathleen Pearson, Main Street, inquired about the additional potential tenant that would be moving in to the facility.  Mr. Kirrane confirmed that a future tenant was not yet locked in.  The Chair read the condition that would require any tenant be of compatible use and not negatively impact the sanitary use of the facility or detrimental impact to surrounding properties.  Mr. Lehrer read through the conditions of the Draft Decision.  There was discussion regarding the signage and replication of Cape Cod Coffee's previous sign.

There were no additional comments.

**MOTION:  Mr. Balzarini made a motion to close the Public Hearing.  Mr. Callahan seconded the motion.  All voted unanimously.**

**MOTION:  Mr. Balzarini made a motion to approve the Decision as presented.  Mr. Callahan seconded the motion.  All voted unanimously.**

**NEW BUSINESS**
**Charles Rowley, August Invoice-** An invoice dated September 3 was received in the amount of $1,440 for regular Planning Board business in August.

**MOTION:  Mr. Balzarini made a motion to pay Charles Rowley $1,440.  Mr. Phelan seconded the motion.  All voted unanimously.**

Planning Board members signed the authorization.

**Set Public Hearing Date for Zoning Article Proposals for October 2019 Town Meeting**

**MOTION:  Mr. Balzarini made a motion to set the Public Hearing for October 2 at 7:10 p.m. Mr. Callahan seconded the motion.  All voted unanimously.**

**OLD BUSINESS**

**CHAIRMAN'S REPORT**
No report at this time.

**BOARD MEMBER COMMITTEE UPDATES**
No updates at this time

**UPDATES FROM TOWN PLANNER**

No updates at this time

**ADDITIONAL TOPICS**

**ADJOURNMENT**
**MOTION: Mr. Balzarini made a motion to adjourn. Mr. Callahan seconded the motion. All voted unanimously. The meeting adjourned at 10:40 p.m.**

Respectfully submitted,

Jennifer M. Clifford
Board Secretary

**LIST OF DOCUMENTS PROVIDED**
*Additional documentation may be available in the Planning Department*
-9/3/19 Charles Rowley Invoice for August
-Kevin Andrade, Best Buy Beverage Application and Plans
-8/30/19 Charles Rowley Report for Evergreen Energy LLC Site Plan Review
-Blue Sky Towers II, LLC Application Located at Town Clerk and Planning Department
-Modi, LLC Application Packet
-Modi, LLC Public Hearing Notice
-8/27/19 Atlantic Engineering Response to Site Plan Review
-5/7/19 Design Review Minutes Regarding Modi, LLC
-5/7/19 Plan Review Minutes Regarding Modi, LLC
-8/22/19 Evan Lehrer Request for Town Counsel Review, Adjacent Properties
-8/23/19 Legal Opinion Adjacent Properties
-8/22/19 Evan Lehrer Request for Town Counsel Review, Undisturbed Natural State
-8/23/19 Legal Opinion Undisturbed Natural State
-8/27/19 Jack Phelan Participation in a Session of an Adjudicatory Hearing
-Draft Decision, Modi, LLC
-9/4/19 Charles Rowley, Cape Cod Coffee Plan Review
-Design Guidelines, Cape Cod Coffee
-9/4/19 Terrie Cook Memo Regarding October Town Meeting Zoning Bylaw Warrant Articles

**Mashpee Planning Board**
**Minutes of Meeting**
**October 2, 2019 at 7:00 p.m.**
**Mashpee Town Hall-Waquoit Meeting Room**
**16 Great Neck Road North**
**Approved 10/23/19**

**Present:** Chairman Mary Waygan, Vice Chairman Joe Cummings, Dennis Balzarini, Joseph Callahan, John (Jack) Phelan
**Also:** Evan Lehrer-Town Planner
**Absent:** Robert (Rob) Hansen (Alt.)

**CALL TO ORDER**
The Town of Mashpee Planning Board meeting was opened with a quorum in the Waquoit Meeting Room at Mashpee Town Hall by Chairman Waygan, at 7:00 p.m. on Wednesday, October 2, 2019. The Pledge of Allegiance was recited.

The Chair stated that the meeting was being videotaped and recorded and anyone wishing to address the Board, should do so at the microphone. All comments would be made through the Chair and as needed, directed to other Board members, staff, project proponent or taken under advisement.

**APPROVAL OF MINUTES—August 21, 2019, September 4, 2019 and September 25, 2019**

**MOTION: Mr. Balzarini made a motion to accept the minutes of August 21 as presented. Mr. Cummings seconded the motion. 4 yes, 1 abstain.**

The September 4 minutes were tabled until the next meeting and the September 25 minutes were not yet available.

**PUBLIC HEARINGS**
**7:10 p.m.       October 21, 2019 Town Meeting Warrant, Proposed Zoning Amendments**
**                      Warrant Article 26: To amend Section 174-45.4-Accessory Apartments**
**                      Warrant Article 27: To amend Section 174-25 (A)(8) in the Table of Use Regs**
**                      Warrant Article 28: To amend Section 174-3 Terms Defined**
The appointed time having arrived, the Chair opened the Public Hearing and read for the record the Public Hearing Notice. The Chair explained that, in order to meet the deadline, the Planning Board had submitted revisions to the ADU Bylaw three months ago to the Board of Selectmen. The Board of Selectmen offered their comments to the changes, after which the Planning Board hosted a workshop to further discuss the comments and accept public comment. Additional changes were made and the changes were now being considered in this official Public Hearing.

Mr. Balzarini inquired whether the Bylaw allowed up to two bedrooms in the accessory apartment. It was confirmed that the septic system could allow for the two bedrooms, as determined through a Building Permit. Plans would be certified by the Board of Health, confirming that the existing septic system could handle the added flow. Mr. Balzarini inquired whether a bedroom could be eliminated from the principal dwelling unit in order to add a bedroom to an existing garage and Mr. Lehrer

1

responded that a Demolition Permit from the Building Department could allow for the removal of one bedroom.

There were no additional comments from Planning Board members.  Mr. Lehrer pointed out the BOS suggested changes, in consultation with Town Counsel, including the expansion of the term "Property Owner."

The Chair invited the Public to comment.

Elana Doyle, Sunset Strip, supported the adjustments to the ADU, referencing the issues of housing in Mashpee and the need for more units.  Ms. Doyle added that there was a lack of housing production at affordable prices and creative options were necessary.  Ms. Doyle suggested that ADUs could add units without changing the look of the Town as well as provide an income stream, allow older adults to age in place and allow younger families to remain on Cape.  Ms. Doyle asked that the community support the Articles.

Jewell Blake, Great Neck Road South, inquired whether it was required that the main home be occupied by the owner.  Mr. Lehrer responded that the principal dwelling unit should not be occupied by anyone other than the property owner as listed on the deed.

Terri Ronhock, Sunset Circle, commended the Board and Town Planner for bringing the matter forward and appreciated allowing the public to be involved during the workshop.  Ms. Ronhock felt the changes would be a win-win for the residents of Mashpee by providing increased housing units, and recommended supporting the changes at Town Meeting.

Lauren Kenzer, Riverview Ave., stated that she was a housing advocate and referenced the Cape Cod Commission's 2008 report regarding affordable housing strategies.  Ms. Kenzer shared experiences regarding the opportunity to provide housing for aging parents through an ADU.  Ms. Kenzer inquired whether the owner could move in to the ADU in order to rent the home, but Mr. Lehrer stated that the owner of the home needed to remain in the principal dwelling unit.  Ms. Kenzer suggested that Mashpee consider allowing the owner to live in the apartment or the home, to allow for aging in place.  Ms. Kenzer shared her support for the ADU changes and the ways in which it could benefit the community, also suggesting the possibility of Mashpee offering loans to assist homeowners creating an ADU.

Lisa Prento, Veterans Lane, thanked the Board for their work, stating that, as a realtor, faced with illegal apartments, the ADU bylaw changes would create a more level playing field and supported the changes as written.

Katie Martin, former Mashpee resident, supported the ADU Bylaw changes, referencing the shortage and high prices of rentals on Cape, and the benefit of allowing homeowners to create an ADU by right.  In addition, Ms. Martin referenced the lack of affordable housing options and the benefit of adding rental stock and creating a revenue stream for homeowners.  Ms. Martin emphasized the need to evolve with the needs of the Town's people, while noting that density would promote growth while preserving raw land and encouraged the passing of these bylaw changes.

2

Stephanie Simpson works with the elderly and emphasized the need for those homeowners to remain in their homes, with a little extra help, rather than entering into a care facility. The bylaw changes would also allow for younger families to remain in the community. Ms. Simpson added that a focus needed to be on year round residents rather than second home owners.

Elaine Sweeney, Clover Lane, offered her support for the bylaw changes and thanked the Board for their work. Working in Human Resources, Ms. Sweeney had seen the challenge of identifying housing to fill positions, noting that short term rentals and affordable housing options were needed on the Cape. Ms. Sweeney wished to maintain the character of Mashpee, but to be able to offer more housing options, and shared her support of the bylaw changes.

Robert Maffei, Nicolettas Way and Taurus Drive, noted that he chose Mashpee to raise his family and to start his business, expressing his support for the ADU bylaw changes. Mr. Maffei stated that it was challenging to recruit workers with the housing shortage here on the Cape. Mr. Maffei stated that his company had acquired housing in an effort to assist with recruiting employees.

Michael Ronhock, Sunset Circle, stated his support for the ADU bylaw changes and inquired about height restrictions for ADUs. Mr. Lehrer responded that the building height maximum was 35 feet, with no plans to expand the height requirements at the next Town Meeting.

Sharon DeFrancisco, Scituate Road, inquired whether there was a maximum number of people allowed to rent an ADU. The Chair stated that Board of Health Regulations addressed the matter and Mr. Lehrer confirmed that Zoning did not address the allowable number of people. The Chair referenced the OSID definition and Mr. Lehrer responded that there was a limit of two people, but he proposed to have that struck from the definition since it would eliminate families.

Mr. Lehrer noted that First Citizens Federal Credit Union had established a loan program for the construction costs associated with building of an ADU. The Chair announced that an email was received from Noelle Pina supporting the ADU bylaw changes.

There was no additional comment.

**MOTION: Mr. Balzarini made a motion to close the Public Hearing. Mr. Callahan seconded the motion. All voted unanimously.**

**MOTION: Mr. Balzarini made a motion to recommend this Article 26 to Town Meeting. Mr. Cummings seconded the motion. All voted unanimously.**

**MOTION: Mr. Phelan made a motion to accept Article 27 to present to Town Meeting and recommend Town Meeting passage. Mr. Balzarini seconded the motion. All voted unanimously.**

**MOTION: Mr. Balzarini made a motion to recommend Article 28 to Town Meeting. Mr. Callahan seconded the motion. All voted unanimously.**

**7:20 p.m.**   **Blue Sky Towers II, LLC (Continued from September 4, 2019)**
                **Application for a Special Permit to erect a Personal Wireless Service Facility as**
                **required by Section 174-25 (H)(9); 174-45.3 of the Mashpee Zoning Bylaw at 101**
                **Red Brook Road, Mashpee Fire Station #2 consisting of a 150' monopole. This**
                **Public Hearing is being reopened by the Planning Board following referral to the**
                **Cape Cod Commission as a Development of Regional Impact (DRI).**

The appointed time having arrived, the Chair opened the Public Hearing for Blue Sky Towers II, LLC
and read for the record the request. Attorney Elizabeth Thompson, representing Blue Sky Towers II,
LLC, stated that she submitted a memo responding to requests for additional information as well
responding to comments made at the last meeting. The Chair stated that the memorandum appeared as
Exhibit 37. Ms. Thompson confirmed that she also submitted the NEPA report and Mr. Lehrer
confirmed that the information was available on the Planning Board's webpage.

The Chair referenced the September 4 minutes and inquired further about the project proponent's
meeting for abutters with their project engineer, Mr. Moreeno, and how the meeting was noticed. Ms.
Thompson stated that the meeting was April 24 and the space was secured by Terrie Cook in the Town
Manager's office. There were no attendees at the meeting, which was noticed at the same time as the
balloon test, 10 days prior to the meeting. Ms. Thompson indicated that they were not required to hold
the meeting, but had volunteered to do so in an effort to include the community in the process.

Ms. Thompson stated that the project proponent had also reached out to the individuals who had filed
the lawsuit, willing to meet at any time. The Chair inquired whether there was any word regarding the
suit being heard in court and Ms. Thompson responded that it had been filed, but not scheduled and
was pending litigation. Mr. Balzarini inquired how the Planning Board could provide a decision if
there was a pending case. Ms. Thompson clarified that the case was an appeal of the decision provided
by the Zoning Board of Appeals, which had no bearing on the Special Permit Decision of the Planning
Board. It was the Chair's opinion that the Planning Board could keep the matter open until the Court
rendered a decision. Ms. Thompson disagreed, stating that the project proponent had provided all
necessary information to allow the Planning Board to make a decision, further stating that the Federal
Telecommunications Act called for a speedy tribunal. There was discussion noting that this meeting
was the second meeting of the second application. The Chair stated her opinion that the Board was
moving at a steady pace. Ms. Thompson inquired whether the question was posed to Town Counsel.
The Chair stated that the question had not yet been posed and Mr. Balzarini stated that they were
unaware that there was a court case during the first application. The Chair expressed concern about
confidential information being shared, and again stated that the question had not been posed to Town
Counsel. Mr. Balzarini inquired again how the Planning Board could make a decision when the status
of the ZBA decision was unclear and Ms. Thompson responded that both permits were necessary to
proceed to build a tower higher than what was allowed. Mr. Balzarini stated that a 40 foot tower was
allowed at the proposed site, where a 150 foot tower was needed and Ms. Thompson responded that
the matter was removed from the Planning Board's jurisdiction because the site was outside of the
Wireless Overlay District. Ms. Thompson further stated that the project proponent would await the
decision of the court to determine whether they could utilize a 40 foot tower. Mr. Balzarini inquired
how the ZBA could award a variance to place the tower at the proposed site when Town Meeting voted
down Article 14, so the zoning was never changed. Mr. Lehrer responded that the Wireless Overlay

District was specific to the height of the tower so the applicant sought relief from the Zoning Board for the height because the use was already allowed in the R-3 district. The Chair acknowledged Mr. Balzarini's question and stated that variances were not always a good fit outside of the district, which was a concern, and asked if the project proponent was willing to keep the hearing open until the matter regarding the appeal of the ZBA decision was settled. Ms. Thompson responded that they were not willing to keep the hearing open.

Mr. Phelan sought confirmation that the ZBA granted the variance and Ms. Thompson confirmed that they had. Referencing the last meeting when the Chair indicated that the Fire Department would be in receipt of a $100,000 payment, Mr. Phelan inquired whether that existed in the lease agreement. Ms. Thompson responded that there was a payment to be made to the Town. Mr. Phelan clarified that it was to the Capital Improvement Plan and Ms. Thompson agreed. Mr. Phelan stated that the Capital Improvement Plan would maintain infrastructure throughout the Town and the $100,000 payment would not be made to the Fire Department, nor was the Fire Department stated in the lease agreement. Mr. Phelan referenced the property sites analysis, tower heights and views from Dover Road, Nancy Lane and Windermere and noted that the Comcast Tower was 250 feet and another privately owned tower was 330 feet, both of which were much taller than the proposed tower. Regarding alternative heights, Mr. Phelan noted that 22 sites had been reviewed and Ms. Thompson responded that many more had been considered. Regarding Outside Distributed Antenna Systems (ODAS), Mr. Phelan indicated that they were very costly, required significant infrastructure and still needed to be tied to a base station. Additionally, the system was backed with battery power, which would only last for a few hours during a power outage. ODAS provided service only for cellular and could not address public safety needs or trunking abilities for the radio system. Ms. Thompson stated that Exhibits 10 and 14 were letters from the Radio Frequency Engineers from Verizon and T-Mobile who stated that small cell systems were not feasible.

Mr. Callahan inquired about the 22 sites and whether any were feasible and Ms. Thompson confirmed that they were not feasible.

The Chair acknowledged Mr. Lehrer, who stated that a letter had been received from Sharon DeFrancesco regarding the project. The Chair stated that she would summarize the letter during Public Comment.

The Chair invited the public to comment, asking that those who had already spoken or provided testimony did not need to repeat what had already been stated. The Chair asked first for those who supported the application.

Chief Thomas Rullo, Fire Chief and resident of Mashpee, stated that the importance of the tower to the entire community should be strongly considered. Chief Rullo referenced this past summer's microburst, which highlighted the existing problems in New Seabury, and residents being unable to make calls or felt stranded in the area, unable to call 911. Chief Rullo stated that visitors to the area would be expecting cellular service and emphasized that the lack of service presented a public safety issue. Chief Rullo expressed concern that, should this application not be successful, it could be a long time before someone else could provide service. Chief Rullo stated that the tower would enhance the Fire Department's radio service, which was severely hampered. The Chair referenced the tower plan

on the lease, highlighting the Town EMS Antenna System and inquired whether that was the service to which Chief Rullo referred and the Chief confirmed that a system would enhance the repeater. The Chair further referenced the rent and one-time payment of $100,000 Capital Contribution for the landlord's development, equipment and construction costs associated with communication equipment. Chief Rullo was unsure. Mr. Balzarini stated that, when reviewing the map of cell phone coverage, areas at South Cape Beach or Popponesset would still not be covered or be sporadic. Mr. Balzarini understood that there was a need for a cell tower and Chief Rullo stated that likely one cell tower would not solve the issue. Mr. Balzarini agreed that another tower may be necessary and inquired why it would not be placed correctly the first time. Chief Rullo believed that two towers would be necessary to address the coverage gap, adding that this application was a step in the right direction. Chief Rullo also expressed concern regarding the 5G network that could further tax the existing cell towers.

Seeing no additional speakers who supported or were neutral about the application, the Chair invited comment from those who opposed the application and asked again for those who had not yet addressed the Board.

Dana Robert, Degrass Road, quoted Ms. Thompson's description of an RFP from the last meeting, when asked whether other sites had been considered. Mr. Robert stated that there would be no reason to consider alternative sites if they were responding to an RFP. It was Mr. Robert's opinion that alternative sites should have been considered prior to the issuance of an RFP. As such, Mr. Robert contacted the Town Manager's office and spoke with Ms. Cook, requesting a list of other sites considered, but there was no document listing such sites. In communication with Town Manager Rodney Collins, Mr. Robert was advised that the former Town Planner, Tom Fudala, had recommended the site and was encouraged to speak with him regarding additional sites. It was Mr. Robert's opinion that, as the author of the RFP, Mr. Collins should have done his due diligence in selecting a site. It was the opinion of Mr. Robert that New Seabury should have been selected as the site in order to address the coverage issues for everybody. Mr. Robert agreed that improved coverage was necessary but that the cell tower should be completed in the correct manner. According to the map coverage, 400 people would continue to have no coverage. Mr. Robert submitted his email correspondence with the Town Manager's office to Mr. Lehrer, to be distributed to Board members.

The Chair stated that, at the end, she would invite the project proponent to respond to comments.

Frank DeSelene referenced the unreliable cell service in the area, and issues of safety and suggested that it seemed to be more practical to place the tower where it was needed in New Seabury. Mr. DeSelene stated that the tower would likely be welcomed in New Seabury and would solve the problem, adding that there was sufficient space to allow for the tower in New Seabury.

Inessa Arsentyeva, Old Great Neck Road, had spoken previously but this time addressed concerns regarding the tower's one mile location from the ocean and potential impacts in situations such as a tsunami. Mr. Balzarini suggested that the proposed cell tower would be located three miles from the ocean. Ms. Arsentyeva cited sources regarding communication tower impacts to the bird population.

6

Terry Ronhock, Sunset Circle and Degrass Road, had spoken previously, but this time addressed her prior suggestion that Mr. Lehrer look into Cape towns utilizing Distributed Antenna System (DAS) and how they were working and inquired whether the Chair had been in receipt of such research. The Chair had not and Mr. Lehrer responded that research had not been done, but he would add it to his agenda, further noting that it was not relevant to the current application. Ms. Ronhock completed research on her own, reporting that Provincetown used the system. Ms. Ronhock spoke with the Dennis Town Planner, Daniel Fortier who confirmed that they were using the system, with 12 systems approved by their Planning Board. Dennis liked the systems in order to provide necessary cell coverage but also because they had restrictive zoning bylaws that did not allow for cell tower heights above 30 feet in residential areas. Ms. Ronhock further stated that Mr. Fortier indicated the systems worked best in beach areas and asked if he would be willing to speak with Mr. Lehrer, but he responded that he had already discussed the systems with him. Ms. Ronhock also researched systems in Wellesley, Martha's Vineyard and Nantucket and provided research for the Board's consideration. Ms. Ronhock noted that David Maxim's initial Isotrope report to New Seabury indicated that DAS was a viable system. Ms. Ronhock reported that New Seabury already had a system designed. It was Ms. Ronhock's opinion that the DAS was a superior system that would not create coverage gaps.

Mr. Lehrer responded that he regularly spoke with his colleagues, but that he never spoke with Mr. Fortier regarding cell towers or DAS systems, adding that his last conversation with Mr. Fortier was seeking a reference for 950 Falmouth Road for affordable housing. Mr. Lehrer stated that he would not withhold information from the Board or the public.

Ms. Ronhock submitted her documentation to Mr. Lehrer for distribution to Board members and the project proponent.

The Chair recognized the project proponent to address any comments. Ms. Thompson stated that there was not one site that would cover every gap, but that it was up to the carriers to identify the gaps in coverage and the best solutions to address those gaps. Ms. Thompson stated that this location was the only solution. Regarding the RFP, only one site had been put forward and Ms. Thompson would have no idea whether or not the Town had considered additional sites. Ms. Thompson stated that the independent site analyses completed by the applicant and service providers was separate from the RFP. Ms. Thompson noted that the RFP provided an attractive option because the Town was a willing landlord, creating the only solution to address a significant gap. Ms. Thompson referenced the NEPA report in regard to the oceans and wildlife which indicated that there would be no adverse impacts to the ocean or wildlife, historic properties or endangered species. Ms. Thompson also encouraged review of the analyses provided by the RF engineers stating that DAS would not be feasible technologies for the location, adding that anecdotal evidence did not have any bearing on the application being considered since testimony had been received that the tower was needed in the proposed location. Regarding the Peninsula Club, Ms. Thompson stated that there could have been a report indicating that an alternative system could work by the water, but there were not two federally licensed service providers stating that it would close the gap. Ms. Thompson asked that the Board carefully review her memorandum identifying the federal parameters of the law, adding that the applicant had conclusively shown there was a coverage gap and capacity problem, and that they had two carriers that could bring services to the area and there was no alternative technologies to address the issues. Ms. Thompson asked that the Board close the public hearing and vote on the matter, or

continue the deliberations to another night.  Ms. Thompson stated that they would not agree to another continuance because they had presented their case and answered all questions posed.

Mr. Balzarini inquired about the 22 sites referenced for review and Ms. Thompson responded that the Town's RFP put forward one location and had no bearing on the review of sites considered by the service providers.

There were no additional comments from Board members.

Chairman Waygan stated that she would like to ask for advice from Town Counsel regarding keeping the public hearing open until the appeal of the ZBA decision was heard by the Court.  Ms. Thompson asked to comment but the Chair requested that there first be discussion among Board members.  The Chair stated that once the Public Hearing was closed, they would be unable to consult with Town Counsel and she felt it was not unreasonable and would be good advice to receive from Town Counsel. Mr. Balzarini stated he wished to read Ms. Thompson's memorandum and the Chair stated she wished to review the 400 page NEPA report.  Mr. Callahan stated that the appeal process was separate from the Planning Board's decision.  The Chair stated that, in the past, the Planning Board had kept open Special Permit Public Hearings that were related to a court case.  The Chair added that the project proponent was citing Federal law and the Federal Telecommunications Act to act quickly.  The Chair wished to draft a letter to the Town Manager to pose the question to Town Counsel whether the hearing could remain open.  If the hearing was closed, the Board could continue to deliberate but could not take in any additional information or ask any additional questions.  Mr. Phelan stated that the Planning Board needed to do their due diligence and read the necessary information as soon as possible, adding that he had read all of the information because it was provided before the meeting. Mr. Phelan added that any project proponent deserved the consideration, and the memorandum had been sent prior to the meeting in order to answer the questions asked at the last meeting.

The Chair inquired whether there was a motion to authorize the Chair to place a request for Town Counsel to keep the public hearing open until the court case was complete.  Mr. Phelan stated that the matters were separate and if the ZBA decision failed in court, the project proponent would only be allowed to build a 36 foot tower.  Mr. Phelan asked for a vote.

The Chair recognized individuals who sent in letters to include:  Support-Nancy Noonan, Janet Shlemigan, Mary Ann Brennan Newcomb; Concerns-Barry and Jewel Blake, regarding the Horatio Amos House.  Ms. Thompson stated that the findings in the NEPA report on page 46 confirmed that there were was no visual impact.  Ms. Thompson added that there was also a summary of findings available, and agreed with Mr. Phelan that there was a responsibility with the Board and the applicant to review the information provided.  Ms. Thompson reiterated that the applicant would not be agreeing to a continuance.

Sharon Muller was recognized by the Chair and stated that she lived next door to the Horatio Amos House, adding that when she reviewed the balloon photos with Mr. Lehrer one year ago, she found the balloon visible.  Mr. Lehrer stated that the exhibits were included in the record.  Ms. Muller also inquired about emissions and safety checks, and suggested that there should be conditions to ensure that there would be no emission problems.  Ms. Thompson stated that Photo #8 included the Horatio

Amos House, and #4 in the NEPA summary report stated there were no adverse impacts.  The photo was reviewed, which was taken toward the balloon, and there was no visual of the balloon.

Regarding additional correspondence, the Chair added that:  Opposition-Michael and Teresa Ronhock, John and Jane Lebel, Jody Davis and Freda Bryon, Wendy and Danielle Pennini, Donna and Steve Gallagher, Joan Ford, Michelle Swilla, Barbara Allen, Jody Bergeron, Lisa Pasquali, John Halperin, David Coughlin, Peter and Laraine Michaelson, Alexander and Bella Slavin, Diane and Dennis Scannell and Jane Scannell.  In addition, the Chair referenced a 17 page petition submitted in opposition to the project, which had not been cross referenced to letters sent individually, but represented 250 signatures.

The Chair referenced an email received from Sharon DeFrancesco, who was present at the meeting.  Ms. DeFrancesco had inquired whether the Town could release an RFP without specifying a location but questioned how only one parcel of town-owned land could be the only plausible location for the cell tower.  Mr. Lehrer responded that Towns issued RFPs in order to solve a problem, granting development rights on Town owned property.  The site at Red Brook Road had been identified as a solution to address the coverage gap and respondents could submit a proposed plan to address the problem.  Mr. Lehrer further stated that the RFP could not grant development without the proposer acquiring the appropriate permitting.  Additionally, a town could only issue an RFP on a parcel that they owned.  Ms. DeFrancesco inquired about another possible site and Mr. Lehrer responded that it was his understanding that there was no other parcel within the search area that could provide a solution to the coverage problem, and the coverage deemed adequate.  Ms. DeFrancisco inquired whether it was the Town's goal to provide complete coverage and Mr. Lehrer responded that complete coverage would be ideal but that the problem had been identified and a solution proposed, but no solution would be perfect.  The Chair read the first sentence of the RFP Introduction, and indicated that she did not recall specific details for coverage location.  The Chair was unsure about the Committee that developed the RFP, suggesting that there could have been a detailed discussion directly with the respondents.  Ms. DeFrancesco stated that she understood there to be a problem that needed to be addressed, noting that it was likely additional technology would be needed and, as a resident and taxpayer, suggested that the project be completed correctly the first time.

The Chair asked how many additional members of the public wished to speak, wanting to allow further comment from Board members and the project proponent, before discussing the closure of the Public Hearing.  Mr. Phelan suggested that the same issues continued to be discussed.

Mr. Robert referenced the RFP requirements and the Chair responded that she would be reading the RFP again.

The Chair recognized the project proponent.  Ms. Thompson stated that the RFP was issued by the Town, and the site had been within an active search ring for many years.  The problem was not new, and this application was the first solution to the problem.  Ms. Thompson further indicated that there was no perfect solution, and that the solution was dictated by the carriers and not the Town or public.

There were no additional comments from the Board members.  The Chair suggested considering a motion to close the Public Hearing and deliberate at the next public meeting.  The Board would not be

able to take additional information and would not be able to consult with Town Counsel. There was consensus from the Board. Mr. Balzarini confirmed that he wished to deliberate further.

**MOTION: Mr. Balzarini made a motion close the Public Hearing. Mr. Callahan seconded the motion. All voted unanimously.**

Mr. Lehrer asked to make a comment about Special Permit procedure but the Chair would not allow it because the Public Hearing was closed, adding that he could speak directly as a staff member.

A recess was taken 9:10 p.m. and the meeting reconvened at 9:14 p.m.

**NEW BUSINESS**
**Charles Rowley, September 2019 Invoice-**An invoice in the amount of $300 was received for regular services for the month of September.

**MOTION: Mr. Phelan made a motion to authorize payment of Charles Rowley $300 for the services of September 2019. Mr. Callahan seconded the motion. All voted unanimously.**

Authorization was signed by Planning Board members.

**Mashpee Commons Development Agreement-**The Chair reported that a letter had been received from Attorney Eliza Fox, representing Mashpee Commons, to finalize the Cape Cod Commission's Notice of Intent for a Development Agreement.

**OLD BUSINESS**

**CHAIRMAN'S REPORT**
The Chair announced the Cape Cod Commission's Community Climate meetings, one of which would be held at the Mashpee Library on Tuesday, October 29 at 10:00 a.m. Other meetings were being held throughout the Cape.

**BOARD MEMBER COMMITTEE UPDATES**
**Cape Cod Commission-**No update
**Design Review Committee-**Mr. Callahan reported that two signs were approved, one at 44 Falmouth Road and one for Ropes and Gray Insurance.
**Community Preservation Committee-**No meeting
**Plan Review-**Mr. Lehrer reported that an application had been submitted for marijuana use and manufacturing at Summerfield Park. Modifications to the Special Permit were needed to allow the use. Mr. Lehrer stated that there were code related issues that needed to be addressed but that Plan Review had offered approval, pending those resolutions. The ZBA would be considering modification to the Special Permit for the use.
**Environmental Oversight Committee-**No meeting
**Greenway Project & Quashnet Footbridge-**No meeting
**Historic District Commission-**No meeting
**Military Civilian Advisory Council-**Mr. Phelan reported that his first meeting would be next week.

**UPDATES FROM TOWN PLANNER**
    **Discussion on amending standards for development in C-3 Districts and the requirements established in Section 174-31, special footnote 14, at a future Town Meeting**-Mr. Lehrer provided his proposed language for amending the standards.  The Chair asked that the matter be considered at a future meeting.  There was discussion regarding specificity of planting species and Cape Cod Commission recommended plantings for landscape designs.

**ADDITIONAL TOPICS**

**ADJOURNMENT**
**MOTION:  Mr. Balzarini made a motion to adjourn.  Mr. Callahan seconded the motion.  All voted unanimously.  The meeting adjourned at 9:16 p.m.**

Respectfully submitted,


Jennifer M. Clifford
Board Secretary

**LIST OF DOCUMENTS PROVIDED**
*Additional documentation available online at the Mashpee's Planning Board website page*
-September 2019 Invoice from Charles Rowley
-September 20, 2019 Letter from Eliza Cox Regarding Mashpee Commons' Notice of Intent with Cape Cod Commission for a Development Agreement
-Cape Cod Commission's Community Climate Meetings
-Public Hearing Notice for Warrant Articles 26, 27 and 28
-Warrant Articles 26, 27 and 28
-9/23/19 Noelle Pina Letter Supporting the ADU Bylaw Changes
-10/2/19 Letter from Sharon DeFrancesco Regarding Blue Sky Towers
-Proposed Amendment to Special Footnote 14

**Mashpee Planning Board**
**Minutes of Meeting**
**October 16, 2019 at 7:00 p.m.**
**Mashpee Library-Event Room**
**64 Steeple Street**
**Approved 10/23/19**

**Present:** Chairman Mary Waygan, Vice Chairman Joe Cummings, Dennis Balzarini, Joseph Callahan, John (Jack) Phelan, Robert (Rob) Hansen (Alt.)
**Also:** Evan Lehrer-Town Planner, Charles Rowley-Town Consultant Engineer

**CALL TO ORDER**
The Town of Mashpee Planning Board meeting was opened with a quorum in the Event Room at Mashpee Library by Chairman Waygan, at 7:00 p.m. on Wednesday, October 16, 2019. The Chair welcomed attendees and stated that the meeting was being videotaped and recorded. As there was no Public Hearing scheduled, the Chair noted that it was unlikely that members of the audience would be recognized to speak. The Pledge of Allegiance was recited.

**APPROVAL OF MINUTES—September 4, 2019, September 25, 2019 and October 2, 2019**
The October 2 minutes were tabled. Regarding the September 4 minutes, the Chair asked that the last name of the Fire Chief be confirmed, that it be noted Mr. Balzarini discussed the monopole be camouflaged as a tree and that the Chair stated she was unsure if the variance granted by the ZBA would be applicable for a monopole at 101 Red Brick Road.

Upon review of the written notes and recording from September 4, the Board Secretary confirmed that it was Police Captain Thomas Rose and not Fire Chief Thomas Rullo who provided public comment during the Public Hearing. The minutes of September 4 were amended to reflect Mr. Balzarini's preference regarding the pole camouflaged as a tree in the second paragraph on page 11. It was confirmed that the statement regarding applicability of the variance granted by the ZBA was documented during the October 2 meeting on page 5 in the first paragraph.

**MOTION: Mr. Balzarini made a motion to accept the minutes of September 4th as amended. Mr. Callahan seconded the motion. All voted unanimously.**

There were no modifications proposed for the September 25 minutes.

**MOTION: Mr. Balzarini made a motion to accept the minutes of September 25th as presented. Mr. Callahan seconded the motion. All voted unanimously.**

**NEW BUSINESS**
        **Deliberation and possible vote on application of Blue Sky Towers II, LLC for a Special Permit to erect a 150 foot Personal Wireless Facility at 101 Red Brook Road (Mashpee Fire Station #2)**-The Chair read the request for the record and requested a motion from the Board to accept the proposal as presented, accept the proposal as presented with conditions or deny the Special Permit.

1

**MOTION:  Mr. Phelan made a motion to accept the proposal as written with conditions, the condition being that it successfully go through the ZBA process.  Mr. Callahan seconded the motion.**

Initiating deliberations, the Chair invited Mr. Phelan to offer any findings to support the motion.  As it was Mr. Phelan's first deliberations, he deferred to the senior members of the Board.  The Chair invited Mr. Callahan to present any findings, who also deferred.  The Chair confirmed that she had written findings but invited other members to present their findings.

Mr. Balzarini stated that he was against the permit because it had been addressed at Town Meeting. Mr. Balzarini stated that the site had never been zoned to allow for the cell tower.  Mr. Balzarini stated that Town Meeting voted down Article 14, suggesting that it was a done deal.  Mr. Balzarini indicated that a failed Article could not be revisited at Town Meeting for another two years and inquired how the matter could then be considered by the Zoning Board of Appeals, when it failed at Town Meeting.  In addition, Mr. Balzarini stated that there would be double coverage from the Industrial Park to the proposed site, but where the service was needed in New Seabury and South Cape Beach, the proposed cell tower would offer only spotty coverage.  Mr. Balzarini further stated that the people of New Seabury could petition to have the cell tower placed in New Seabury, noting that there would be sufficient land, and it would provide better coverage.  Mr. Balzarini noted that the proposed site covered wilderness areas and indicated that he would vote against the motion.

Mr. Cummings stated that he would also vote against the motion, agreeing with Mr. Balzarini regarding the zoning, adding that the tower did not belong at the proposed site.  Mr. Cummings added that the proposed site would not provide the necessary coverage and recommended that it should be sited at New Seabury on the golf course.

The Chair offered the findings she drafted.  The Chair stated that findings were necessary in the event that the matter was appealed to Federal Court and it would be necessary for the Board to provide their reasonings if they did not accept the ramifications of the Federal Communications Act.

### *TOWN of MASHPEE ZONING BYLAWS DOES NOT ALLOW THE PROPOSED WIRELESS COMMUNICATIONS FACILITY AT 101 REDBROOK ROAD, MA:*

*The personal wireless service facility, a 150' monopole telecommunication tower, is proposed at 101 Red Brook Road, Mashpee MA (Assessor's Map 104, Lot 2) in Zoning District R-3.*

*101 Red Brook Road is located **outside** the Town of Mashpee Wireless Facility Overlay District.*

*The use and construction of a **ground mounted 150 foot wireless service facility (monopole) is not permitted outside** the Town of Mashpee Wireless Facility Overlay District. Outside of the District, a ground-mounted facility can only by ten (10') feet higher than the surrounding building or trees:*

> *Article III Section 174-5.C The Wireless Facility Overlay District shall include…all other land in the Town not located…within the R-3 or R-5 Zoning Districts…*

2

*Article IX Section 174-45.3..E.1 "Height General - Regardless of the type of mount, personal wireless service facilities shall be no higher than ten (10') feet above the average height of buildings within three hundred (300') feet."*

*Article IX Section 174-45.3.E2.  Height, Ground-Mounted Facilities - Ground-mounted personal wireless service facilities shall not project higher than ten feet above the average building height or, if there are no buildings within three hundred (300 feet, these facilities shall not project higher than ten feet above the average tree canopy height, measured from ground level (AGL). If there are no buildings within three hundred (300') feet of the proposed site of the facility, all ground-mounted personal wireless service facilities shall be surrounded by dense tree growth to screen views of the facility in all directions. These trees may be existing on the subject property or planted on site.*

**Only within the District can a height of 150 feet be permitted:**
*Article IX Section 174-45.3.E.6 "Within the Wireless Facility Overlay District, personal wireless service facilities of up to one hundred (100') feet in height may be permitted by Special Permit, except that the Planning Board may grant a waiver to allow height up to two hundred (200') feet where circumstances warrant (e.g. no serious impacts on neighboring properties, residential areas...).*

*In conclusion, the Mashpee Zoning Bylaw does not permit a 150' personal wireless service facility at 101 Red Brook Road as the land is located in zoning district R-3 and outside the Wireless Facility Overlay District.*

Chairman Waygan, Mr. Balzarini and Mr. Cummings agreed with the finding.
Mr. Phelan and Mr. Callahan disagreed.

Mr. Phelan stated that he disagreed with the finding because the ZBA provided a variance, so that it was irrelevant that the site was outside the Wireless Overlay District.  Mr. Callahan agreed with Mr. Phelan that the ZBA granted a variance.  Mr. Balzarini stated that the project proponent sought a variance for the height and not the location, but Mr. Phelan stated that the variance was for both.

The Chair referenced page 7 of her findings addressing that matter.

**MASHPEE ZONING BOARD OF APPEALS DECISION FOR A VARIANCE V-2019-10 WILL NEVER BE EFFECTIVE IN THIS MATTER, PER THE MASHPEE ZONING BYLAW AND M.G.L. Ch. 40A.**

*As shown above, the Mashpee Zoning Bylaw does not permit a 150 foot personal wireless service facility at 101 Red Brook Road as the land is located in zoning district R-3 and outside the Wireless Facility Overlay District.*

*The 150' personal wireless service facility, which is **not permitted outside the Wireless Facility Overlay District**, cannot be sited or constructed at 101 Red Brook Road, Mashpee, a location outside the District, by a variance issued by the Town of Mashpee Zoning Board of Appeals as the Mashpee Zoning Bylaws do not expressly allow for a variance to authorize a prohibited use, per MGL CH 40A and the Mashpee Zoning Bylaw:*

3

*Mass. General Law Ch 40A the Zoning Act Section 10. Variances states: Except where local ordinances or bylaws shall expressly permit variances for a use, no variance may authorize a use or activity not otherwise permitted in the district in which the land or structure is located;*

*The Mashpee Zoning Bylaw does not expressly permit variances in this way; in fact, the bylaw expressly prohibits them:  Article VI Section 174-24.K. …No use specifically listed in the Table of Use Regulations shall be allowed by the Zoning Board of Appeals in any district where it is prohibited.*

**In conclusion, 150' personal wireless service facilities are prohibited outside of the Wireless Facility Overlay District, and a variance from the Mashpee Zoning Board of Appeals cannot authorize any 150 foot personal wireless service facility outside the Wireless Facility Overlay District.**

The Chair summarized the various districts located in town, noting that districts had been identified in order to prevent allowable uses within a district, outside of that district, with a variance from the Board of Appeals.  If a variance could be granted, it would allow uses from the commercial or industrial district in residential districts.  Chapter 40 A stated that it would need to be part of the Mashpee Zoning Bylaw, which it did not.

Chairman Waygan, Mr. Balzarini and Mr. Cummings agreed with the finding.
There were no additional opinions expressed.  The Chair could not recognize Mr. Hansen because he did not sit on the matter.

The Chair referenced page 6 in her findings.

### *MASHPEE ZONING BOARD OF APPEALS DECISION FOR A VARIANCE V-2019-10 IS NOT EFFECTIVE IN THIS MATTER*

*A complaint (No. 1972CV/30) has been filed in the Commonwealth of Massachusetts Barnstable County Superior Court challenging the decision of the Town of Mashpee Zoning Board of Appeals to issue a variance (V-2019-10) to Blue Sky Towers II, LLC.*
*In conclusion, variance V-2019-10 has not been recorded with the Barnstable County Registry of Deeds or Land Court and is at this time not effective.*

Chairman Waygan, Mr. Balzarini and Mr. Cummings agreed with the finding.
The Chair invited opinions and Mr. Phelan responded that, because the matter was being appealed, it could not yet be recorded.

Mr. Callahan wished to return to discussion regarding the variance and the Chair cautioned Mr. Callahan for accepting any information from anyone in the room, including receiving a note.  Mr. Callahan indicated that height was the issue.  The Chair responded that extra height could not be granted outside of the district, except when certain requirements were met, such as the offering of open space with the OSID Bylaw.  Mr. Phelan stated that it was different for town-owned property and the Chair asked for the reference in the Zoning Bylaw that would indicate it was different.  Mr. Phelan stated that the matter was a public safety issue.  Mr. Balzarini inquired about installing a 100 foot tower for public safety communications but Mr. Phelan stated that it would insufficient.  The Chair asked for the Bylaw allowing for matters of public safety be identified as a means to violate the

Bylaws. Mr. Phelan inquired how the ZBA would have been allowed to grant the variance if it was not allowed by the Bylaw. The Chair stated that the Planning Board attempted to acquire the information from the applicant, who refused to discuss it and information was not submitted during the Public Hearing. Mr. Phelan stated that the ZBA issued their variance during a public meeting. Mr. Balzarini suggested that it was illegal because the tower was not zoned for the proposed site. The Chair referenced the variance located in Exhibit 7, quoting that the project proponent would "need height to remedy the gap in service." The Chair further quoted the variance on page 6 whether it would be a detriment to the public good, but letters received from First Responders demonstrated a need for the coverage and would not be a detriment but it would help to serve and protect the public.

The Chair referenced the Appeal, Exhibit 32, but it was Mr. Phelan's opinion that the ZBA Appeal was not relevant because it had been granted. The Chair stated that, in Item 16, the variance could be granted related to soil, shape or topography and structures, but not as it affected the zoning district. Mr. Phelan noted that the statement was part of the appeal, which would be considered by a judge, and was not a fact. The Chair stated that the applicant was asked to allow for a continuance for the matter to be heard in the court system, but they did not wish to do so. Mr. Phelan stated that the 1996 Telecommunications ACT required that the matter move along quickly. The Chair stated that the ZBA cited public safety, but the statement indicated that it had no effect. In order to amend the Zoning Bylaw to take into consideration Public Safety, it would need to occur at Town Meeting, and the voters at Town Meeting voted against placing the site into the Wireless Facility Overlay District. As a result, public safety could not be used as a reason to go against the Bylaw, supported by a legal opinion. The Chair added that variances typically could only be given in cases of soil condition, shape or land structure, like a rock in the way of a driveway. The Chair reiterated that they had asked the applicant to wait, but they did not wish to do so. The Chair stated that they could not set a precedent allowing a variance to overrule everything.

Mr. Balzarini inquired about the specific variance awarded and the Chair responded that it was a height variance, but the Chair suggested that it was a use variance. Mr. Cummings suggested that the reasoning was height and safety. The Chair stated that if a height was allowed in a particular district, a variance could not be used to locate it outside the district.

Mr. Phelan stated that two variances were awarded on page 6 of the Decision, the R-3 zone and a 160 foot height variance. Mr. Balzarini stated that the hardship discussed the height and not the topography. Mr. Phelan noted that Ms. Thompson explained the hardship during discussion.

Chairman Waygan, Mr. Balzarini and Mr. Cummings still agreed with the finding.
Mr. Phelan did not agree with the finding because the ZBA granted the variance and Mr. Callahan agreed with Mr. Phelan that the variance had been given by the ZBA.

The Chair referred the Board to page 8 of the findings, noting that the Planning Board should be the only Board to waive a height.

### *MASHPEE ZONING BOARD OF APPEALS DECISION FOR A VARIANCE WOULD NOT BE EFFECTIVE EVEN IN THE WIRELESS OVERLAY DISTRICT, PER THE MASHPEE ZONING BYLAW*

*Even in the Wireless Facility Overlay District, the Planning Board is the entity which <u>may</u> grant a waiver to allow height of a personal wireless service facility of up to 200 feet, and only if there are no serious impacts on neighboring properties.   There is no provision that height restrictions may be waived by the Zoning Board Of Appeals:*

> *Article IX Section 174-45.3.E.6 "Within the Wireless Facility Overlay District, personal wireless service facilities of up to one hundred (100') feet in height may be permitted by Special Permit, except that the <u>Planning Board may grant a waiver to allow height up to two hundred (200') feet where circumstances warrant</u> (e.g. no serious impacts on neighboring properties, residential areas…).*

Mr. Phelan inquired about specific examples of serious impacts and the Chair responded that issues could be aesthetics, property value loss or a home located in a fall zone. Mr. Phelan stated there were no homes in the fall zone. Mr. Phelan inquired whether the Chair was suggesting that the Planning Board should take action against the ZBA and the Chair responded that she did not join the appeal, adding that she stated on September 4 that she was not confident that the variance would hold. Mr. Phelan stated that the Court would make the determination. Mr. Balzarini stated that the ZBA went beyond their boundaries. Mr. Callahan stated that the Planning Board needed to address what was in front of them. Mr. Phelan expressed concern that Board members were concerned with aesthetics over public safety matters. There was clarification that they were discussing page 8, and that the ZBA was not the place to acquire a variance, but the Planning Board was the authority to waive the height. Mr. Phelan asked why it was not discussed with the project proponent and the Chair responded that Ms. Thompson did not wish to discuss it and Mr. Balzarini responded that he had questioned how the ZBA was able to grant a variance. There was disagreement as to whether or not the matter was adequately explained. Mr. Balzarini stated that he lived at his home for 37 years and heard no complaints regarding safety and he had no issues with Verizon. Mr. Callahan stated that there was testimony last spring indicating that people were unable to make calls to 911. The Chair asked for a location in the Bylaw that allowed acceptance of the proposal due to public safety. Mr. Balzarini stated that the cell tower should be located where it could benefit the most people, the first time. Mr. Phelan stated that the ZBA granted the variance and the Court would offer the legal judgement.

Chairman Waygan, Mr. Balzarini and Mr. Cummings agreed with the finding.

The Chair referenced page 9.

### <u>THE MASHPEE ZONING BYLAW REQUIRES COMPLIANCE WITH PROVISIONS FOR MONITORING AND MAINTENANCE, AS WELL AS ABANDONMENT OR DISCONTINUANCE OF USE</u>

*The Blue Sky Tower's application fails to address how the proposed wireless service facility will be monitored and maintained, and how it shall bond the facility in case of abandonment or discontinuance of use in compliance with the following sections of the Zoning Bylaw:*

1. *Article IX Section 174-45.3.L Monitoring and Maintenance provisions (1), (2), and*
2. *Article IX Section 174-45.3.M Abandonment or Discontinuation of Use provisions (1), (2), and (3)*

Mr. Phelan stated that the Telecommunications Act of 1996 clearly outlined the concern, in 143 pages, to address all the issues. In addition, Section 704 required that the Board be very specific in their

reasons if they were to deny the tower. The Chair had asked that the project proponent address the matter, but they did not.

Chairman Waygan, Mr. Balzarini and Mr. Cummings agreed with the finding.
Mr. Phelan and Mr. Callahan disagreed with the finding.

Mr. Balzarini stated his opinion that Town Meeting voted against allowing the placement of the cell tower at the proposed site and, therefore, the applicant should not have refiled for another two years. In addition, the zoning change should have been considered by the Planning Board, and then considered by the Town. Mr. Phelan stated that Town Counsel, at the meeting, indicated that the Article was not required and was irrelevant. The Chair stated that the Board of Selectmen had offered an amendment to the Article and referenced page 5 which addressed the matter.

### *TOWN MEETING DID NOT AMEND THE TOWN OF MASHPEE ZONING BYLAW TO INCLUDE  101 REDBROOK ROAD IN THE WIRELESS FACILITY OVERLAY DISTRICT*

*The Town Meeting is the legislative body for the Town of Mashpee with the power to adopt and amend laws, referred to as bylaws that regulate the use of land. Mashpee Town Meeting defeated a motion to amend the zoning bylaw to permit a 150 foot personal wireless service facility at 101 Red Brook Road, Mashpee, MA (Assessor's Map 104, Lot 2).*

*Mashpee Annual Town Meeting on October 15, 2018 voted to defeat Article 14:*

> *Article 14: To see if the Town will vote to amend the zoning bylaw Section 174-5. Establishment of Zoning Map as follows: At the beginning of Section c.2 add the phrase "that parcel of land shown on the 2017 Mashpee Assessor's Maps as Map 104, Block 2*

> *Explanation: This article would amend the Zoning Bylaw by including within the Wireless Facility Overlay District a parcel of Town-owned land in Red Brook Road so that a proposed cell tower could be permitted (by Planning Board Special Permit) on the property.*

*In conclusion, Town Meeting voted against amending the zoning bylaw to allow the 150 foot personal wireless service facility at 101 Red Brook Road.*

Mr. Phelan again stated that Town Counsel had indicated that the Bylaw was not required. The Chair responded that Town Meeting, the ultimate legislative body, disagreed. The Chair further stated that she was elected by the people and did not wish to go against the people. Mr. Phelan stated that he was thinking of the people and public safety. The Chair stated that a Town Meeting vote could not be ignored.

Chairman Waygan, Mr. Balzarini and Mr. Cummings agreed with the finding.

The Chair returned to page 1 regarding adverse impacts.

### *PROPOSED MONOPOLE WOULD INFLICT THE PRECISE ADVERSE IMPACTS THAT PROVISIONS OF THE MASHPEE ZONING BYLAW WERE ENACTED TO PREVENT.*

*The specific intent behind the enactment of the Mashpee Zoning Bylaw:*

7

*Article 1 Purpose and Validity Section 174-1 Purpose; Establishment of Districts: …the height, area, location and use of building and structures and the use of land throughout the Town of Mashpee are hereby regulated as provided herein, and the town is hereby divided into districts hereinafter designated, defined and described…),*

*Article VI – Land Use Regulations Section 174-24.C. 2 A special Permit may be issued only following the procedures specified by the General Laws and maybe approved only if it is determined that the proposed use or development is consistent with applicable state and town regulations, statutes, bylaws, and plans,…,will not have a significant impact on… neighboring properties.*

*Article IX Section 174-45.3.A. Personal Wireless Service Facilities: Purpose and Intent: For the purpose of minimizing the visual and environmental impacts, as well as any potential deleterious impact on property values, of personal wireless service facilities, no personal wireless service facility shall be placed, constructed or modified within the town except in compliance with the requirements of this section, in conjunction with other regulations adopted by the Town…"*

*Special Permit requirement for the construction and use of a personal wireless service facility cannot be granted unless and until the Board finds that the facility will not adversely affect the neighborhood.*

*The Proposed Tower Will Inflict Dramatic and Wholly Unnecessary Adverse Impacts Upon the Aesthetics and Character of Neighboring Homes.   There is Substantial Evidence of the Actual Adverse Aesthetic Impact the Proposed Tower Would Inflict Upon the Residential Area.*

*The people who own homes abutting and in close proximity to 101 Red Brook Road have concluded and testified that the proposed wireless service facility will have an unacceptable, adverse aesthetic impact on their homes, and have called for the Planning Board to deny the Blue Sky Tower special permit application.  These include:*
    *Letter from Barry and Jewel Blake dated September 17, 2019*
    *Letter from Jerilyn Collier Davis and Freda Bryon-Twyman dated May 29, 2018*
    *Email from Joan Ford dated May 13, 2019*
    *Email from Peter and Laraine Michaelson dated May 6, 2019*
    *Letter Jane Scannell dated May 9, 2019*

*It is the finding of one or more Planning Board member upon reviewing the Photographic Simulations of the proposed wireless service facility, which resulted from a balloon test conducted on 4/4/2018, that the property at 95-103 Degrass Road and 56 Blue Castle would be suffer significant and unacceptable adverse aesthetic impact, and that the proposed monopole would dominate the aesthetics of the homes.*

*It is the finding that the project proponent failed to modify the plan to reduce the aesthetic impact on the abutting and neighboring property, such as moving the facility away from the abutting properties and/or camouflaging the monopole as a tree, i.e. a monopine.*

Mr. Phelan disagreed with the finding, stating that only two homes would be affected, as compared to many more at a location in New Seabury.  Mr. Balzarini suggested that there would be less homes

impacted at the real estate office at New Seabury.  The Chair stated that they were in receipt of 5 letters and 2 views.  Mr. Phelan stated that he had a 365 foot tower behind his home, and the value of his home had quadrupled and it was his opinion that the values would not be impacted.  Mr. Callahan added that the project proponent indicated that they would be happy to camouflage the pole and Mr. Phelan agreed that it was on record.  The Chair stated that no modification to the plan had been received and she had heard no commitment to the monopine, or response in writing to Mr. Balzarini's request about the monopine.  The Chair had requested that Ms. Thompson address any comments from the September 4 minutes, but did not, and she also refused to allow there to be a continuance.  Mr. Phelan stated that Ms. Thompson felt she had answered all of the questions.  Mr. Callahan again stated that Ms. Thompson offered the option of camouflage.

Chairman Waygan, Mr. Balzarini and Mr. Cummings agreed with the finding.
Mr. Phelan and Mr. Callahan disagreed.

Mr. Phelan and Chairman Waygan disagreed about findings versus opinions.

The Chair turned to page 2 of her findings and read.

### *THE PROPOSED TOWER WILL INFLICT SUBSTANTIAL AND WHOLLY UNNECESSARY LOSSES IN THE VALUES OF ADJACENT AND NEARBY RESIDENTIAL PROPERTIES.*

*The people who own homes abutting and in close proximity to 101 Red Brook Road have concluded and testified that the proposed wireless service facility will inflict wholly unnecessary losses in the values of their properties, and have called for the Planning Board to deny the Blue Sky Tower special permit application.  These include:*

> *Letter from Barry and Jewel Blake dated September 17, 2019*
> *Letter from Jerilyn Collier Davis and Freda Bryon-Twyman dated May 29, 2018*
> *Letter from Michael and Teresa Ronhock dated December 24, 2018*
> *Email from Wendy and Daniel Pennini dated May 12, 2019*
> *Email from Donna and Steve Gallagher dated May 13, 2019*
> *Email from Barbara Allen dated May 5, 2019*
> *Email from Jody Bergeron dated May 5, 2019*
> *Email from Lisa Pasquali dated May 5, 2019*
> *Email from Peter and Laraine Michaelson dated May 6, 2019*
> *Email from Alexander and Bella Slavin dated May 7, 2019*
> *Email from Diane and Dennis Scannell dated May 15, 2019*

*Mr. Michael Ronhock also provided the following analysis entitled:*

> *Property Value and Property Tax Impact*
> *Blue Sky Towers Project Proposal at 101 Red Brook Road*

*which concludes that **all homes** within 400 yards of the proposed wireless service facility **would decline in assessed value in the range of 10% to 20%.**__*

Mr. Phelan stated that he disagreed, adding that the distance of the tower from the property exceeded 1200 feet and some of the properties listed by Mr. Ronhock had no view of the tower.  Mr. Phelan suggested that Mr. Ronhock's study was presented in the finding as superseding the analysis provided by the project proponent.  The Chair stated that the project proponent's study did not consider property value and tax impact before and after tower installation, adding that the homeowners were best suited to determine whether the value of their homes would decline.  Mr. Phelan again stated that the issue was a public safety matter and the Chair again stated the necessity to identify the location in the Bylaw that allowed cause for devaluation of property values as a public safety matter.

Chairman Waygan agreed with the finding.
Mr. Phelan disagreed.

The Chair referenced page 3 of the findings but Mr. Phelan asked to dispense with the reading due to the lengthiness of the reading.

**MOTION:  Mr. Phelan asked to dispense with the reading as Board members were in possession of the document.**

The Chair did not accept the motion.  Mr. Phelan made a point of order, adding that the motion could be seconded for discussion.  The Chair stated that the Chair was responsible for entertaining motions.

**MOTION:  Mr. Phelan asked to dispense with the reading.**

The Chair indicated that if she did not read the findings in to the record, it could cause problems.

**Mr. Callahan seconded the motion.  3 yes, 1 no**

The Chair stated that she needed to read the document in to the record.

### *BLUE SKY TOWERS II, LLC HAS FAILED TO ESTABLISH THAT LESS INTRUSIVE AND MORE COMPLIANT ALTERNATIVES ARE NOT AVAILABLE*

*Blue Sky Tower II, LLC's application fails to establish that it cannot remedy any coverage gap by alternative measures that would inflict substantially less adverse impacts.  Blue Sky Towers II, LLC has continually ignored that:*
1. *it can, in fact, fulfill its coverage needs through less intrusive and more zoning compliant means.*
2. *vast areas of coverage is open space and conservation land located in the Mashpee National Wildlife Refuge. These areas will be closest to the facility and would have the best and high quality coverage; and*
3. *the most densely populated areas of coverage are at the fringe of coverage, will have the <u>least reliable</u> coverage, and be most vulnerable to lose coverage as usage by other customers increase.*

*Less intrusive and more compliant alternatives include*
1. *service coverage by the construction of an Outdoor Distributed Antenna System (ODAS)*

*systems such as C-RAN/Cloud-RAN.*
    a.  *These antennas are placed on existing structures, such as utility poles and building*
    b.  *ODAS would provide coverage of the <u>populated areas of the gap</u> and NOT the Mashpee National Wildlife Refuge*
    c.  *ODAS could be zoning compliant with respect to height and allowed inside or outside the Wireless Facility Overlay District*

2. *Distributed Antenna System (DAS) has constructed in Wellesley, MA, Dennis,MA, Provincetown, MA and on the island of Nantucket*
3. *Both Verizon and T-Mobile, the carriers with the identified gap in service, have both employed DAS systems.*
4. *abutters have provided list of potential alternative sites located in the populated areas of the identified gap in Mashpee*

*It is a further finding of one or more Planning Board member(s) that it is unreasonable for Blue Sky to reject and defeat less intrusive and more compliant alternatives to provide coverage in the identified area due to the following documents to which the applicant voluntarily responded or agreed:*

1.  *Request for Proposals (RFP) for the Lease of Property to be Use for the Installation of Cellular/Wireless Equipment Mashpee Fire Station #2 101 Red Brook Road, Mashpee MA published May 10, 2017*
2. *Lease Agreement by the Town of Mashpee and Blue Sky Towers, LLC for 10,000 square feet at 101 Red Brook Road, Mashpee, MA executed October 17, 2017.*

Chairman Waygan, Mr. Balzarini and Mr. Cummings agreed with the finding.

Mr. Phelan stated that the project proponent stated and documented that there were no other options.

The Chair inquired whether there were additional findings to propose or additional comment prior to taking a vote on the motion being considered (MOTION STATED ON PAGE 1 OF THESE MINUTES) which the Chair reiterated as a motion to accept the application for Special Permit by Blue Sky Tower II, LLC with the condition that the Variance 2019-10 is effective and recorded at the Registry of Deeds.

**Roll Call Vote:  Mr. Balzarini-no; Mr. Cummings-no; Chairman Waygan-no; Mr. Phelan-yes; Mr. Callahan-yes**

The Chair asked Mr. Lehrer to draft the decision. The Chair wished to review and sign the decision, and approve the minutes for October 2. The Chair wished to review the minutes prior to initiating the 20 day appeal period. The next meeting was scheduled for Wednesday, October 23 at 7:00 p.m. Mr. Lehrer clarified that one person would sign the decision but the Chair asked that the entire Board review the decision and the October 2 minutes. The Chair's findings document would be sent electronically to Mr. Lehrer and the Board Secretary.

**OLD BUSINESS**
    None at this time

**CHAIRMAN'S REPORT**

Sewer Commission Meeting-October 17, 2019
Town Meeting-October 21, 2019
Board of Selectmen Special Meeting on Nitrogen Management/Waste Water Planning-October 28, November 25 and December 9, 2019
Cape Cod Commission Climate Change Initiative-October 29, 2019 at 10 a.m.
Cape Housing Institute-November 15, 2019
MVP Kick Off meeting-November 15, 2019

## BOARD MEMBER COMMITTEE UPDATES

Cape Cod Commission-The Climate Change Initiative Meeting was October 29 at 10 a.m.
Design Review Committee-No meeting
Community Preservation Committee-Applications due November 1 at the Town Manager's office.
Plan Review-No meeting
Environmental Oversight Committee-Bylaws at Town Meeting regarding straws and styrofoam
Greenway Project & Quashnet Footbridge-No meeting
Historic District Commission-No meeting
Military Civilian Advisory Council-Mr. Phelan reported that the meeting was canceled and postponed to February.
Stormwater Task Force-No meeting

## UPDATES FROM TOWN PLANNER

Discussion on amending standards for development in C-3 Districts and the requirements established in Section 174-31, special footnote 14, at a future Town Meeting-The Chair asked that the information be resent to Board members.

Municipal Vulnerability Preparedness Program-Mr. Lehrer asked for Planning Board participation, adding that the kick off was an 8 hour workshop that would include community stakeholders to develop a community visioning process. Mashpee was working toward becoming certified MVP in order to address climate change and resiliency concerns. Once certified, Mashpee would be eligible to pursue grants to address such projects as beach nourishment, public safety and regulatory reform.

## ADDITIONAL TOPICS

## ADJOURNMENT

MOTION: Mr. Balzarini made a motion to adjourn. Mr. Callahan seconded the motion. All voted unanimously. The meeting adjourned at 8:15 p.m.

Respectfully submitted,


Jennifer M. Clifford
Board Secretary

## LIST OF DOCUMENTS PROVIDED

*Additional documentation may be available online at Mashpee's Planning Board website page*
-Findings offered by Chairman Waygan